# THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-018

Filing Date: May 6, 2021

No. S-1-SC-38228

STATE OF NEW MEXICO, ex rel.
M. KEITH RIDDLE, in his official capacity
as Clerk of Catron County, and Chair of
the New Mexico County Clerks Affiliate;
SHELLY K. TRUJILLO, in her official capacity
as Clerk of Sierra County, and Chair Elect of the
New Mexico County Clerks Affiliate;
LINDA STOVER, in her official capacity
as Clerk of Bernalillo County, and Vice President
of the New Mexico Association of Counties;
MICHELLE E. DOMINGUEZ, in her official capacity
as Clerk of Cibola County;
RAYETTA M. TRUJILLO, in her official capacity
as Clerk of Colfax County;
ROSALIE A. GONZALES JOINER, in her official capacity
as Clerk of De Baca County;
AMANDA LOPEZ ASKIN, in her official capacity
as Clerk of Dona Ana County;
ROBIN VAN NATTA, in her official capacity
as Clerk of Eddy County;
MARISA CASTRILLO, in her official capacity
as Clerk of Grant County;
PATRICK Z. MARTINEZ, in his official capacity
as Clerk of Guadalupe County;
C.J. GARRISON, in her official capacity
as Clerk of Harding County;
MELISSA K. DE LA GARZA, in her official capacity
as Clerk of Hidalgo County;
NAOMI D. MAESTAS, in her official capacity
as Clerk of Los Alamos County;
ANDREA RODRIGUEZ, in her official capacity
as Clerk of Luna County;
HARRIETT K. BECENTI, in her official capacity
as Clerk of McKinley County;
CARLOS ARELLANO, in his official capacity
as Clerk of Mora County;
ROBYN HOLMES, in her official capacity
as Clerk of Otero County;

ELLEN L. WHITE, in her official capacity
as Clerk of Quay County;
LINDA J. PADILLA, in her official capacity
as Clerk of Rio Arriba County;
GERALDINE E. GUTIERREZ, in her official capacity
as Clerk of San Miguel County;
EILEEN GARBAGNI, in her official capacity
as Clerk of Sandoval County;
GERALDINE SALAZAR, in her official capacity
as Clerk of Santa Fe County;
BETTY SAAVEDRA, in her official capacity
as Clerk of Socorro County;
ANNA MARTINEZ, in her official capacity
as Clerk of Taos County;
LINDA JARAMILLO, in her official capacity
as Clerk of Torrance County;
MARY LOU HARKINS, in her official capacity
as Clerk of Union County; and
PEGGY CARABAJAL, in her official capacity
as Clerk of Valencia County,

      Petitioners,

v.

MAGGIE TOULOUSE OLIVER,
in her official capacity as Secretary of State,

      Respondent,

and

REPUBLICAN PARTY OF NEW MEXICO,
DAVE KUNKO, Chaves County Clerk,
KEITH MANES, Lea County Clerk,
WHITNEY WHITTAKER, Lincoln County Clerk,
TANYA SHELBY, San Juan County Clerk,
Senator STUART INGLE,
Senator CRAIG BRANDT,
Senator BILL BURT,
Senator GREGG FULFER,
Senator GAY KERNAN,
Senator MARK MOORES,
Senator STEVE NEVILLE,
Senator CLIFF PIRTLE,
Senator SANDER RUE,
and Senator WILLIAM SHARER,

**Representative JIM TOWNSEND,**
**Representative PHELPS ANDERSON,**
**Representative GAIL ARMSTRONG,**
**Representative RACHEL BLACK,**
**Representative PAUL BANDY,**
**Representative CATHRYNN BROWN,**
**Representative JACK CHATFIELD,**
**Representative ZACH COOK,**
**Representative RANDAL CROWDER,**
**Representative CANDY EZZELL,**
**Representative DAVID GALLEGOS,**
**Representative JASON HARPER,**
**Representative TIM LEWIS,**
**Representative ROD MONTOYA,**
**Representative GREG NIBERT,**
**Representative JANE POWDRELL CULBERT,**
**Representative BILL REHM,**
**Representative GREGG SCHMEDES,**
**Representative LARRY SCOTT,**
**Representative JAMES STRICKLER, and**
**Representative MARTIN ZAMORA,**

Intervenors.

**ORIGINAL PROCEEDING**

Released for Publication June 15, 2021.

In Accord, PC
Daniel A. Ivey-Soto
Albuquerque, NM

for Petitioners

Office of the Secretary of State
Tonya Noonan Herring, General Counsel
Albuquerque, NM

Dylan Kenneth Lange, Special Assistant Attorney General
Santa Fe, New Mexico

for Respondent

Harrison & Hart, LLC
Carter B. Harrison IV
Albuquerque, NM

for Intervenors

Office of the Governor
Matthew L. Garcia, Chief General Counsel
Jonathan Jacob Guss, Deputy General Counsel
Santa Fe, NM

for Governor Michelle Lujan Grisham

Hinkle Shanor LLP
Thomas M. Hnasko
Santa Fe, NM

Michael B. Browde
Albuquerque, NM

for The New Mexico Legislative Council

Elsner Law & Policy, LLC
Gretchen Elsner
Santa Fe, NM

for The Democratic Party of New Mexico

Stephen P. Curtis Attorney at Law, PC
Stephen P. Curtis
Albuquerque, NM

for The Libertarian Party of New Mexico

Felicia L. Orth
Los Alamos, NM

for Amicus Curiae League of Women Voters of New Mexico

Hall & Monagle, LLC
Levi A. Monagle
Albuquerque, NM

Preston Michael Sanchez
Albuquerque, NM

Tim Gardner
Albuquerque, NM

Sara K. Berger
Portland, OR

Leger Law & Strategy

Teresa Isabel Leger
Santa Fe, NM, NM

for Amici Curiae Like-Minded Organizations Joining the League of Women
Voters Amicus Brief: Common Cause, American Civil Liberties Union of New
Mexico, Disability Rights of New Mexico, Native American Voters Alliance
Education Project, and Santo Domingo Pueblo

Antoinette M. Sedillo Lopez
Albuquerque, NM

for Amicus Curiae University of New Mexico Constitutional Law Professors

And Justice Legal, LLC, dba And Justice Law
Melanie Joyce Rhodes
Albuquerque, NM

The Bopp Law Firm, PC
James Bopp, Jr.
Corinne L. Youngs
Amanda L. Narog
Terre Haute, IN

for Amici Curiae Ronnie Cisneros, Darryl Dunlap, Stacie Ewing,
Lynn Lewis, Jessica Sanders, Joe Delk, Dan Banks, Carolyn Banks,
David Cheek, Timothy Burke, and Joye Burke

Navajo Nation Department of Justice
Doreen M. McPaul
Paul W. Spruhan
Window Rock, AZ

for Amicus Curiae Navajo Nation

**OPINION**

**VIGIL, Chief Justice.**

**{1}**     Petitioners are twenty-seven county clerks who sought an emergency writ to compel Respondent, Secretary of State Maggie Toulouse Oliver, to mail absentee ballots directly to all registered voters in lieu of conducting in-person voting in the June 2020 primary election. They requested this extraordinary relief because the primary election was scheduled amidst a global pandemic and national and statewide public health emergency: COVID-19, a new, potentially fatal, viral disease was spreading unchecked throughout the population. Petitioners alleged that in-person voting could not be conducted safely under those circumstances, and they urged us to hold that the

requested relief was necessary to protect the health of election workers, voters, and the general public. Respondent stipulated to the petition.

**{2}**     We allowed the intervention of the Republican Party of New Mexico, thirty-one state legislators, and other county clerks, who argued that the Election Code, NMSA 1978, §§ 1-1-1 to 1-26-6 (1969, as amended through 2020) (noting that all 2020 amendments take effect on January 1, 2023), does not allow elections to be conducted entirely by mail and that it would violate separation of powers principles for a nonlegislative branch of government to implement an alternative election procedure. We requested responses from the Governor of New Mexico, the New Mexico Legislature, the Democratic Party of New Mexico, and the Libertarian Party of New Mexico. We also granted leave to file amicus curiae briefs to the University of New Mexico Constitutional Law Professors, Ronnie Cisneros et al., the Navajo Nation, and the League of Women Voters of New Mexico joined with Common Cause, American Civil Liberties Union of New Mexico, Disability Rights New Mexico, Native American Voters Alliance Education Project, and Santo Domingo Pueblo.

**{3}**     We conclude that the Election Code does not permit the Secretary of State to mail absentee ballots directly to voters without a prior request from the voter. However, the Election Code permits the Secretary to mail absentee ballot applications to voters to encourage and facilitate absentee voting. We further conclude that, under the circumstances created by the COVID-19 pandemic, including the clear and present risk to public health presented by mass gatherings and the executive orders mandating that all branches of government take all lawful steps to mitigate that risk, the Secretary of State had a duty to exercise her power to the fullest extent of the law to promote the safety of election workers and voters while conducting the June 2020 primary election. Therefore, we issued a writ of mandamus ordering the Secretary of State to mail absentee ballot applications to eligible voters to encourage absentee voting and minimize the health risk to the public. This remedy promotes the public health goals mandated by the Governor while not infringing on the Legislature's plenary power to establish election procedures. We issue this opinion to explain our reasoning.

## I.     BACKGROUND

### A.     The COVID-19 Pandemic and the Executive Response

**{4}**     This case arose in the spring of 2020, when New Mexicans faced the prospect of holding their first election since the outbreak of the COVID-19 pandemic. At the time we issue this opinion, the pandemic is ongoing. The public is intimately aware of the origins and early development of the pandemic, as the details of these events have indelibly marked the lives of those who witnessed them unfold. Nevertheless, we recount some salient facts here to provide context for the events at issue in this case.[1]

---

[1]We take judicial notice of facts which are generally known within our jurisdiction or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 11-201(B)(2), (C) NMRA; *see also Grisham v. Romero*, 2021-NMSC-009, ¶ 7, 483 P.3d 545 (taking judicial notice of "(1) the serious health risks posed by COVID-19, a highly contagious and potentially fatal

**{5}**     COVID-19 is the name of the disease caused by the virus SARS-CoV-2, a novel coronavirus first detected in Wuhan, China, in December 2019. World Health Organization (WHO), *Coronavirus disease (COVID-19), What is COVID-19?* (Oct. 12, 2020).[2] It produces a wide range of symptoms including fever, chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, loss of taste, loss of smell, sore throat, congestion, runny nose, nausea or vomiting, diarrhea, persistent pain or pressure in the chest, confusion, inability to wake or stay awake, and bluish lips or face. Centers for Disease Control and Prevention (CDC), *Symptoms of Coronavirus* (Feb. 22, 2021).[3] While some people who contract the virus experience no symptoms, others can develop severe pneumonia, experience neurological problems including seizures, and suffer blood clots and strokes. Harvard Medical School, *COVID-19 basics* (Mar. 9, 2021).[4] Of those who develop symptoms, "[a]bout 15% become seriously ill and require oxygen and 5% become critically ill and need intensive care." WHO, *Coronavirus disease (COVID-19), What happens to people who get COVID-19?* (Oct. 12, 2020).[5] COVID-19 complications that can lead to death "include respiratory failure, acute respiratory distress syndrome (ARDS), sepsis and septic shock, thromboembolism, and/or multiorgan failure, including injury of the heart, liver, or kidneys." *Id.* As of the filing of this opinion, COVID-19 has caused 2,801,695 deaths worldwide; 550,930 deaths in the United States; and 3,932 deaths in New Mexico. Johns Hopkins University, *COVID-19 Dashboard* (Mar. 30, 2021).[6]

**{6}**     COVID-19 spread rapidly after its emergence in December 2019, with the first case detected in the United States on January 21, 2020. CDC, *First Travel-related Case of 2019 Novel Coronavirus Detected in United States* (Jan. 21, 2020).[7] Ten days later, the United States Department of Health and Human Services declared the COVID-19 outbreak a nationwide public health emergency. U.S. Dep't of Health & Human Servs., *Determination that a Public Health Emergency Exists* (Jan. 31, 2020).[8] On March 11, 2020, the World Health Organization announced that COVID-19 had become a pandemic and called on all nations "to take a whole-of-government, whole-of-society approach, built around a comprehensive strategy to prevent infections, save lives and minimize impact." WHO, *Timeline of WHO's Response to COVID-19* (June 29, 2020).[9]

---

disease, (2) the disease's transmission within New Mexico, and (3) the emergency orders issued by Governor Grisham and the Secretary [of Health]" (internal quotation marks and citation omitted)).

2Available at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19 (last visited Mar. 31, 2021).

3Available at https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Mar. 31, 2021).

4Available at https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics (last visited Mar. 31, 2021).

5Available at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19 (last visited Mar. 31, 2021).

6Available at https://www.arcgis.com/apps/opsdashboard/index.html#/bda 7594740fd40299423467b48e9ecf6 (last visited Mar. 30, 2021).

7Available at https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html (last visited Mar. 31, 2021).

8Available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/ 2019-nCoV.aspx (last visited Mar. 31, 2021).

9Available at https://www.who.int/news-room/detail/29-06-2020-covidtimeline (last visited Mar. 31, 2021).

**{7}**     On that same day, the first cases of COVID-19 were detected in New Mexico. State of N.M., Executive Order 2020-004, 2 (Mar. 11, 2020) (EO 2020-004).[10] Governor Michelle Lujan Grisham issued an executive order invoking the All Hazard Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007), and proclaiming a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015). EO 2020-004, 2. Declaring that "it is necessary for all branches of State government to take immediate action to minimize the spread of COVID-19 and to minimize the attendant physical and economic harms," Governor Lujan Grisham mandated that all branches of state government, all political subdivisions, all public health officials, and all cabinets, departments and agencies comply with the order. *Id.* 2-3. The order specifically directed several departments and agencies to take enumerated actions in furtherance of the following stated goals: "to provide resources and services necessary to minimize physical and economic harm and . . . to protect lives"; "to assist in the emergency purchase of all goods and services necessary to contain, respond, and mitigate the spread of COVID-19 in New Mexico"; to expend funds "to protect the public health, safety, and welfare"; and "to provide those resources and services necessary to avoid or minimize economic or physical harm." *Id.* 2-4.

**{8}**     At that time, much was unknown about the virus. There was "no known cure, no effective treatment, and no vaccine." *South Bay United Pentecostal Church v. Newsom*, ___ U.S. ___, ___, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief from restrictions on public gatherings) (mem.). Thus the only means available to halt the spread of the virus were basic public health measures to break the chain of viral transmission: measures such as social distancing, quarantining and isolating, washing hands, disinfecting surfaces, and wearing masks. *See Grisham*, 2021-NMSC-009, ¶ 2; CDC, *How to Protect Yourself & Others* (Mar. 8, 2021).[11] To implement those public health measures, the Secretary of the New Mexico Department of Health issued a series of public health orders limiting mass gatherings, reducing or prohibiting certain business operations, and "strongly advis[ing]" New Mexicans "to stay at home and undertake only those outings absolutely necessary for their health, safety, or welfare." N.M. Dep't of Health, *Pub. Health Emergency Order to Limit Mass Gatherings Due to COVID-19* (Mar. 31, 2020) (PHO 3-16-20) (emphasis omitted), available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (follow hyperlink to "03-16-2020 – Public Health Order") (last visited Mar. 31, 2021); *see generally* N.M. Dep't of Health, *Public Health Orders and Exec. Orders*, available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited Mar. 31, 2021) (showing that the Secretary of Health issued fourteen public health orders between the beginning of the statewide emergency and the June 2020 primary).

---

[10]Available at https://www.governor.state.nm.us/wp-content/uploads/2020/03/Executive-Order-2020-004.pdf (last visited Mar. 31, 2021).

[11]Available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Mar. 31, 2021).

**B.       Preparations for the June 2020 Primary Election**

**{9}**    The primary election was set for June 2, 2020, less than three months into the spread of the pandemic in New Mexico. *See* § 1-8-11. Because it was a presidential election year, a presidential primary election was to be held concurrently with the state primary contests. *See* § 1-15A-2. New Mexico is a closed primary state, meaning that a voter who votes during the primary election must be affiliated with a major political party and may only vote for candidates of the party that is designated on the voter's registration certificate. *See* § 1-12-7. Statewide, there were 129 Democratic, 122 Republican, and 23 Libertarian primary races on the ballot in the June 2020 primary election. New Mexico Sec'y of State, *Voting and Elections, Election Results 2020, 2020 Primary Election Results*.[12] Of those races, fifty-seven were contested. *Id.*

**{10}**   The June 2020 primary required a great deal of logistical preparation and coordination between the Secretary of State, county clerks, and thousands of election workers. "The secretary of state is the chief election officer of the state," whose responsibilities include supervising elections, maintaining uniform election operations, and advising county clerks "as to the proper methods of performing their duties prescribed by the Election Code." Sections 1-2-1 to -2. In turn, county clerks oversee the appointment of approximately 774 election boards throughout the state, each of which consists of one presiding judge, two election judges, and a number of election clerks who are appointed to assist the judges. *See* § 1-2-12. County clerks may also assign their own employees "to provide support to an election board or polling location" as needed. Section 1-2-12(E). Other election workers may include messengers to deliver "election supplies," § 1-2-20(A); voting system technicians, § 1-9-13; and interpreters to assist voters who speak a recognized minority language, §§ 1-2-19, 1-6-5.6(C).

**{11}**   In total, Petitioners planned to hire 3,733 election workers for the June 2020 primary. Most of those election workers were older adults. Over 65% of them—2,444 election workers statewide—were over the age of 60. And in eleven New Mexico counties, over 80% of election workers were over the age of 60. People in that age group are at higher risk of becoming severely ill or dying from COVID-19. CDC, *Older Adults* (Mar. 17, 2021)[13] ("Older adults are at greater risk of requiring hospitalization or dying if they are diagnosed with COVID-19. . . . [Eight] out of 10 COVID-19 deaths reported in the U.S. have been in adults 65 years old and older.").

**C.       The Stipulated Petition**

**{12}**   Petitioners and Respondent filed their stipulated petition on March 30, 2020, asserting that it would be impossible to safely conduct in-person voting in the June 2020 primary election. They pointed to problems, with their workforce and with polling locations, due to the COVID-19 crisis. They alleged that "many experienced election

---

[12]Available at https://www.sos.state.nm.us/voting-and-elections/election-results/election-results-2020/ (follow hyperlink to "2020 Primary Candidate Summary Results Report") (last visited Mar. 31, 2021).
[13]Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Mar. 31, 2021).

workers are unwilling to work" the June 2020 primary election due to health concerns related to the COVID-19 pandemic and that "their most reliable and experienced workers come from an identified high risk population" due to their age group. They also stated that "many" of the 736 election-day and early-voting polling locations were "currently closed with no definitive plans on when they will reopen," placing in jeopardy the county clerks' ability to comply with their statutory duty to "physically inspect" each polling location at least "thirty days" before an election. *See* § 1-3-18(B). They concluded that county clerks faced an untenable choice between "(a) follow[ing] the provisions of the Election Code for the conduct of a statewide election and risk[ing] the lives of their staff and those community members supporting the election process . . . or (b) violat[ing] their oath of office in order to protect the health and safety of their community, their voters, their staffs, and themselves."

**{13}** Petitioners and Respondent acknowledged that the Legislature has plenary power over election procedures, and thus "a decision by the Governor or the Secretary of State to change the manner in which elections are held—even in the face of a deadly pandemic—would . . . violate separation of powers." Petitioners and Respondent argued that "[t]he solution, of course, is for the Governor to call the Legislature into Special Session" to allow the Legislature to promulgate new election procedures. Petitioners and Respondent explained that they had queried the Executive about calling a special session of the Legislature, and that they received a reply indicating that a special session would be disfavored because "[t]he in-person convening of our 112 state legislators has the high likelihood of spreading this dangerous virus among individual legislators and may have the effect of further spreading this disease to every corner of the state upon the return of each legislator to their respective districts." They further noted that there is no provision for the Legislature to convene telephonically.

**{14}** Therefore, "[g]iven the public health crisis, the inability of the Legislature to meet in-person at this time, and the consequences of maintaining the status quo," Petitioners and Respondent proposed an alternative election procedure adapted from the statutes governing special elections. *See* § 1-24-3(A) ("All special elections in this state shall be conducted absentee."). Under this proposal for the June 2020 primary election: (1) there would be no in-person voting except in limited, enumerated circumstances, (2) all election-day polling places would be closed, (3) all ballots would be mailed directly to each voter, without prior voter request, provided that the voter's election-related mail had not been returned and the voter was not on the inactive voter list, (4) any voter who did not qualify for a direct-mail ballot would be sent notice that the voter could take certain steps to request a ballot, and (5) early voting locations would remain open as "service centers" to assist voters who needed special services such as access to a replacement ballot, a provisional ballot, an updated voter registration, accommodation of a disability, or oral language interpretation.

**{15}** Petitioners and Respondent asked us to "issu[e] a writ" directing Respondent to adopt the above-described procedures. Although Petitioners and Respondent did not specify the type of writ they sought, they argued under *State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶¶ 17, 50, 120 N.M. 562, 904 P.2d 11 (issuing the writ of mandamus), that we had original jurisdiction to hear this case because it presented a purely legal

issue involving a fundamental question of great public concern and that the matter should be resolved expeditiously. Thus, Petitioners and Respondent invoked our mandamus jurisdiction and, as the relief requested is in the nature of mandamus, we viewed their request as a petition for writ of mandamus. *See* II(A), *infra*. (discussing mandamus).

## D.    The Response in Intervention

**{16}**    The day after Petitioners and Respondent filed their March 30, 2020, stipulated petition, Intervenors filed a response in intervention that decried the petition as an "audacious" and "open[] entreat[y] . . . to violate separation of powers." Intervenors argued that under the Election Code, all statewide primary and general elections must offer both in-person voting and absentee voting options. The type of vote-by-mail scheme proposed by Petitioners and Respondents is only authorized, Intervenors contended, under two circumstances, neither of which was applicable to the June 2020 primary. Those circumstances are (1) "special elections" in which "only ballot questions, not candidates," are determined and (2) individual precincts that have been designated as "mail ballot election precincts" due to their low population. Intervenors argued that the Legislature was "the indisputably and undisputedly appropriate body for making the changes to the Election Code" requested in the petition and that the Legislature could convene to make such changes either at the request of the Governor or on its own motion if approved by three-fifths of each chamber. N.M. Const. art. IV, § 6. In the absence of legislative action, Intervenors argued, any attempt by the Executive or the Judiciary to implement an election procedure not prescribed by the Election Code would violate constitutional separation of powers. N.M. Const. art. III, § 1.

**{17}**    Intervenors offered an alternative proposal for relief that would, in their estimation, reduce the risks associated with in-person voting while still comporting with the Election Code: "circulating absentee ballot applications to the public and encouraging them to voluntarily vote absentee." Intervenors argued that this solution would "be perfectly legal" and would effectively reduce in-person voting while still providing voters with that option, as required by the Election Code.

## E.    Arguments of Governor and Legislative Council

**{18}**    Due to the importance of this case, we sought input from our coequal branches of government and other interested groups on two issues: (1) the merits of the parties' arguments and (2) whether it would be possible for the Legislature to convene through remote, electronic means in order to timely address the questions presented here. The Governor substantially agreed with Petitioners and Respondent on the merits and argued that the public health emergency empowered this Court to craft an appropriate remedy "to reconcile the constitutional directive that citizen participation in election[s] is to be encouraged with the public safety considerations attendant to [the] COVID-19 pandemic." The Governor implied that she would not call a special session of the Legislature to enact special voting procedures because doing so would endanger public health.

A special session would require 112 legislators from all parts of the State to congregate in an enclosed area along with members of the public, media, and other interested parties during the predicted apex of the epidemic. Caucus meetings, conferences with members of the Governor's staff, and all other attendant gatherings would greatly increase the potential for transmission of the virus. Further, a special session would necessitate the presence of workers such as security guards, custodial services, and aides, all of whom would also face health risks from potential exposure to the COVID-19 virus.

The Governor did not take a position on whether legislative rules would allow the Legislature to convene remotely because the interpretation of legislative rules was not within executive authority.

**{19}** The New Mexico Legislative Council responded on behalf of the Legislature. The Legislative Council represents the entire Legislature while that body is not in session, and it is prohibited "from advocating or opposing the introduction or passage of legislation." NMSA 1978, § 2-3-1 (1978); NMSA 1978, § 2-3-3 (1978). Due to that limitation, the Legislative Council took no position on the merits of this case. On whether the Legislature could convene remotely to timely address the issues presented in the petition, the Legislative Council ultimately concluded that doing so was not feasible. It noted that under Senate and House rules, legislators were required to be physically present in chambers to vote on any bill, resolution, or rule change. While the Legislature could amend its own rules to allow for remote proceedings, the Legislative Council argued that the onus was on the Governor to issue a proclamation convening a special session of the Legislature so that it could vote on such rule changes. The Legislative Council noted that convening the Legislature under the existing public health orders would be inherently difficult because the Legislature did not "possess a methodology for health screening, the prevention of contagion, or the enforcement of appropriate social distancing." Therefore, the Legislative Council concluded that there was no "practical means to assemble a quorum." Moreover, even if it were possible to convene in special session, the Legislative Council concluded that the Election Code could not be amended in time to affect the June 2020 primary.

## F.    Our Writ of Mandamus

**{20}** After oral argument, we issued a writ of mandamus and an order directing Respondent "to mail an application for an absentee ballot to every major party registered voter in New Mexico who has not already submitted an absentee ballot application for the 2020 primary election" and also to conduct in-person voting in compliance with the election code and applicable executive orders and public health orders.

## II.    DISCUSSION

## A.    Mandamus Is an Appropriate Remedy

**{21}**    Article VI, Section 3 of the New Mexico Constitution gives this Court "original jurisdiction in . . . mandamus against all state officers" and the "power to issue writs of mandamus . . . and all other writs necessary or proper for the complete exercise of its jurisdiction."[14]

**{22}**    "Mandamus is a common law writ to compel an inferior tribunal, body or person to perform a public duty [when that] duty results from operation of law or from the office, trust or official position of the party to whom the command is directed." 1 Chester James Antieau, *The Practice of Extraordinary Remedies* § 2.01 (Oceana Publ'ns Inc. 1987). In its original form, the writ was "a mere letter missive from the King to a subordinate functionary, commanding the performance of his duty." Forrest G. Ferris & Forrest G. Ferris, Jr., *The Law of Extraordinary Legal Remedies* § 187 (Thomas Law Book Co. 1926); *see also* Charles T. Dumars & Michael B. Browde, *Mandamus in New Mexico*, 4 N.M. L. Rev. 155, 155 (1974) ("Although the common law origins of the writ of mandamus are somewhat obscure, mandamus apparently began as nothing more than a royal wish or direction conveyed to subordinates regarding something the King wished done." (footnote omitted)). Since the Magna Carta, mandamus has been used "as the great writ to protect the rights of the people when no other remedy is available . . . and justice requires protection." Antieau, *supra*, § 2.01; *see also, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 169 (1803) (noting that mandamus "ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one" (quoting Lord Mansfield in *King v. Baker*, 3 Burrows 1265, 1267 (1762) (internal quotation marks omitted)). The writ of mandamus "is from its very nature . . . a remedy that cannot be hampered by any narrow or technical bounds." Antieau, *supra*, § 2.01 (quoting *T. & B. C. R. Co. v. Iosco Cir. Judge*, 7 N.W. 65, 66-67 (1880) (internal quotation marks and citation omitted)).

**{23}**    Our jurisprudence on mandamus reflects these common law origins. "We have long recognized that mandamus is ordinarily the proper remedy to compel the performance of an official act by a public officer." *State ex rel. Richardson v. Fifth Judicial Dist. Nominating Comm'n*, 2007-NMSC-023, ¶ 9, 141 N.M. 657, 160 P.3d 566

---

[14]By statute, the district court also has "exclusive original jurisdiction in all cases of mandamus . . . ." NMSA 1978, § 44-2-3 (1884). As we noted in *Clark*, Article VI, Section 3's grant of original mandamus jurisdiction to the Supreme Court and Section 44-2-3's grant of exclusive original mandamus jurisdiction to the district court are seemingly contradictory. *Clark*, 1995-NMSC-048, ¶ 16. Yet because our jurisdiction arises from the Constitution, it cannot be removed by statute. *See Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶ 5, 138 N.M. 398, 120 P.3d 820 ("[A]ny legislative measure which affects pleading, practice or procedure in relation to a power expressly vested by the Constitution in the judiciary, such as quo warranto, cannot be deemed binding." (internal quotation marks and citation omitted)); *see also, e.g.*, *State v. Lynch*, 2003-NMSC-020, ¶ 21, 134 N.M. 139, 74 P.3d 73 ("Our basic premise is that the New Mexico Constitution is the supreme law and each department of government must comply with it." (brackets omitted) (internal quotation marks citation omitted)); *City of Las Cruces v. Sanchez*, 2007-NMSC-042, ¶ 20, 142 N.M. 243, 164 P.3d 942 (noting that a constitutional provision "trumps" a statute in conflict with the provision).

(internal quotation marks and citation omitted). Mandamus may be used either "to compel the performance of an affirmative act . . . where the duty to perform the act is clearly enjoined by law," or it may be used "in a prohibitory manner to prohibit unconstitutional official action." *State ex rel. Sugg v. Oliver*, 2020-NMSC-002, ¶ 7, 456 P.3d 1065 (internal quotation marks and citations omitted). Mandamus is often utilized to restrain one branch of government from encroaching on the powers reserved to another branch. *See, e.g.*, *State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 11, 127 N.M. 272, 980 P.2d 55 (analyzing a claimed separation of powers violation under mandamus framework); *Clark*, 1995-NMSC-048, ¶¶ 2, 20 (same). However, "[m]andamus is a drastic remedy to be invoked only in extraordinary circumstances" and will lie "only to force a clear legal right against one having a clear legal duty to perform an act and where there is no other plain, speedy and adequate remedy in the ordinary course of law." *Richardson*, 2007-NMSC-023, ¶ 9 (internal quotation marks and citation omitted); *see also* NMSA 1978, § 44-2-5 (1884) (stating that a writ of mandamus "shall not issue in any case where there is a plain, speedy and adequate remedy in the ordinary course of law").

**{24}**     We have summarized these various considerations in a multifactor test, which we first articulated in *Sandel*, 1999-NMSC-019, ¶ 11. Under the *Sandel* test, mandamus will lie

> when the petitioner presents a purely legal issue concerning the non-discretionary duty of a government official that (1) implicates fundamental constitutional questions of great public importance, (2) can be answered on the basis of virtually undisputed facts, and (3) calls for an expeditious resolution that cannot be obtained through other channels such as a direct appeal.

*Id.*; *see also, e.g.*, *Sugg*, 2020-NMSC-002, ¶¶ 7-8, 11 (applying these factors); *State ex rel. Egolf v. N.M. Pub. Regul. Comm'n*, 2020-NMSC-018, ¶¶ 15-19, 476 P.3d 896 (same).

**{25}**     Yet mandamus is a discretionary writ and flexible by nature, and thus we do not apply those factors in an overly formalistic way. "This Court has never insisted upon a technical approach to the application of mandamus where there is involved a question of great public import and where other remedies might be inadequate to address that question." *Clark*, 1995-NMSC-048, ¶ 18 (brackets omitted) (ellipsis omitted) (internal quotation marks and citation omitted); *see, e.g.*, *Unite N.M. v. Oliver*, 2019-NMSC-009, ¶ 2, 438 P.3d 343 (determining that mandamus was proper solely because the issue involved the separation of powers under Article III, Section 1 of the New Mexico Constitution); *State ex rel. League of Women Voters of N.M. v. Advisory Comm. to the N.M. Compilation Comm'n*, 2017-NMSC-025, ¶ 10, 401 P.3d 734 (analyzing the propriety of mandamus only for whether the question presented a purely legal issue involving a fundamental constitutional question of great public importance); *State ex rel. League of Women Voters v. Herrera*, 2009-NMSC-003, ¶¶ 11-13, 145 N.M. 563, 203 P.3d 94 (determining mandamus was appropriate because the issue was of great public importance and involved the enforcement of a state officer's statutory duty); *County of*

*Bernalillo v. N.M. Pub. Regul. Comm'n* (*In re Adjustments to Franchise Fees*), 2000-NMSC-035, ¶ 6, 129 N.M. 787, 14 P.3d 525 (conditioning a mandamus inquiry on whether "the case presents a purely legal issue that is a fundamental constitutional question of great public importance").

**{26}**   In this case, we conclude that the enumerated *Sandel* factors are easily met and therefore discuss them first. We focus the rest of our analysis on what is presented as the threshold issue in the *Sandel* test: whether the case involves a nondiscretionary duty of a government official.

**1.     This case involves a fundamental constitutional question of great public importance that can be answered on the basis of virtually undisputed facts and requires an expeditious resolution**

**{27}**   The sole question in this case was the proper way to conduct the June 2020 primary election, which implicates a fundamental constitutional question of great public importance. Our democratic form of government derives its legitimacy from the will of the people, as expressed through their vote. *See* N.M. Const. art. II, § 2 ("All political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good."). Thus our Constitution, laws, and courts zealously guard both the right to vote and the legitimacy of the processes through which those votes are cast and counted. N.M. Const. art. II, § 8 ("All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."); N.M. Const. art. VII, § 1(B) ("The legislature shall have the power to . . . regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot and the purity of elections and guard against the abuse of elective franchise."); N.M. Const. art. VII, § 3 ("The right of any citizen of the state to vote . . . shall never be restricted, abridged or impaired on account of religion, race, language or color, or inability to speak, read or write the English or Spanish languages."); §§ 1-1-1 to 1-26-6 (establishing detailed election procedures); *see also, e.g., Valdez v. Herrera*, 1944-NMSC-013, ¶ 25, 48 N.M. 45, 145 P.2d 864 ("[T]his court in a long line of decisions has shown a disposition to be ever zealous in upholding the effective exercise of the individual's right of franchise." (internal quotation marks and citation omitted)).

**{28}**   No constitutional question could be more fundamental or have greater public import than the conduct of elections. *See League of Women Voters of N.M.*, 2017-NMSC-025, ¶ 1 ("[T]he elective franchise . . . is among the most precious rights in a democracy."); *Cobb v. State Canvassing Board*, 2006-NMSC-034, ¶ 39, 140 N.M. 77, 140 P.3d 498 ("[T]he issue of clarifying our Election Code, especially in the current political climate, make[s] this a case of great public importance."); *see also Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."). Thus the first *Sandel* factor is satisfied here.

**{29}**   Additionally, this case could be decided on the basis of virtually undisputed facts. The parties did not dispute the operative facts including the procedure prescribed by the

Election Code, the plenary power of the Legislature to determine election procedures, Respondent's duty to conduct elections in conformity with the Election Code, and the exigent circumstance of the COVID-19 pandemic. Because there was no factual dispute, the issue before us is a legal one.

{30} Similarly, there is no question that this case demanded a speedy resolution that could only come through the exercise of mandamus. Petitioners and Respondent brought this case on March 30, 2020, just sixty-four days before the June 2, 2020, primary election. With the election only weeks away and the public health emergency unabated, the matter of ascertaining what election procedures were lawful could not wait for resolution on direct appeal. *Cf. Gunaji v. Macias*, 2001-NMSC-028, ¶¶ 7, 9, 130 N.M. 734, 31 P.3d 1008 (recognizing that an election issue originally litigated in district court had become moot by the time it reached this Court). "[I]n mandamus cases, when issues of sufficient public importance are presented which involve a legal and not a factual determination, we will not hesitate to accept the responsibility of rendering a just and speedy disposition." *State ex rel. King v. Lyons*, 2011-NMSC-004, ¶ 23, 149 N.M. 330, 248 P.3d 878 (internal quotation marks and citation omitted).

{31} Moreover, although Intervenors suggested that the Legislature might convene to provide relief, no legislative remedy was in fact available. The Governor indicated that she would not convene a special session of the Legislature because it could not be done safely, and the Legislative Council indicated that even if a special session were called, no bill could be passed in time to change the procedures for the June 2020 primary election. Thus, this Court was the only governmental actor that could timely resolve this important issue.

{32} Because this case implicated a fundamental constitutional question of great public importance, involved a legal rather than factual dispute, and required an expeditious resolution, the three enumerated *Sandel* factors are met. We now turn to the critical question of whether Respondent had a nondiscretionary duty in this case.

2. **Respondent has a nondiscretionary duty to ensure that elections are conducted in compliance with the Election Code and all other applicable law**

{33} In a motion for rehearing, Petitioners challenged our issuance of the writ of mandamus on the grounds that it was within Respondent's discretion to mail absentee ballot applications. We disagree. We hold that under the unique circumstances of this case, Respondent had a nondiscretionary duty to mail every eligible voter in New Mexico an application for an absentee ballot in the June 2020 primary election. In this section we explain that Respondent's nondiscretionary duties with respect to that election arose from two sources: the Election Code and the executive orders and public health orders in place at the time. Because Respondent was constrained by her duty arising under the Election Code to conduct primary elections in accordance with the procedures mandated by that Code, we could not order the relief requested. And because Respondent was compelled by her duty arising under the executive orders and

public health orders to conduct the election in a maximally safe manner, we ordered the relief herein described. Our reasoning follows.

### a. The nondiscretionary duty requirement

{34} That a matter brought in mandamus must concern a public official's nondiscretionary duty flows from the nature of the writ. "The purpose of the writ of mandamus is to enforce performance of a public duty after it has been otherwise established, and not to establish legal rights and duties." Antieau, *supra*, § 2.01. Thus, "[a] writ of mandamus . . . cannot control discretion lawfully vested in the official functions of a state official." *Egolf*, 2020-NMSC-018, ¶ 14. But "mandamus is appropriate to determine the outer bounds of that discretion." *King*, 2011-NMSC-004, ¶ 28. We have described a nondiscretionary duty in various ways: as "a ministerial duty that is clear and indisputable," *Am. Fed'n of State, Cnty. & Mun. Emps. v. Martinez*, 2011-NMSC-018, ¶ 4, 150 N.M. 132, 257 P.3d 952; as a "duty . . . [that] is clearly enjoined by law," *Lovato v. City of Albuquerque*, 1987-NMSC-086, ¶ 6, 106 N.M. 287, 742 P.2d 499; and as "an act or thing" that a public official "is required to perform by direction of law upon a given state of facts being shown to exist, regardless of [the official's] own opinion as to the propriety or impropriety of doing the act in the particular case," *El Dorado at Santa Fe, Inc. v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 1976-NMSC-029, ¶ 5, 89 N.M. 313, 551 P.2d 1360 (internal quotation marks and citation omitted).

{35} That a duty is nondiscretionary does not preclude the exercise of judgment on the part of the public official. "The border line between judicial discretion and ministerial duty is not clearcut. It is frequently a matter of degree——a shading from black to white or a grey area which can only be determined in each particular case." *Sender v. Montoya*, 1963-NMSC-220, ¶ 13, 73 N.M. 287, 387 P.2d 860, *overruled on other grounds by State ex rel. Reynolds v. Molybdenum Corp. of Am.*, 1972-NMSC-027, ¶¶ 12-14, 25, 83 N.M. 690, 496 P.2d 1086. Often, a nondiscretionary duty arises only after a public official uses his or her judgment to determine whether a given set of facts exists. *See, e.g., King*, 2011-NMSC-004, ¶ 30 (explaining that the Land Commissioner had a nondiscretionary duty to comply with statutory requirements for land sales after he decided to sell public lands even though the decision to sell land in the first instance was entirely discretionary); *Lorenzino v. State ex rel. James*, 1913-NMSC-071, ¶¶ 3-5, 18 N.M. 240, 135 P. 1172 (explaining that the liquor control board had a nondiscretionary duty to revoke a liquor license after it determined the licensee was operating outside of the licensed location even though it had to exercise judgment in making the initial determination). Thus, language in our cases, "to the effect that mandamus is inappropriate where interpretation and judgment are necessary, must be considered in context, not as an inflexible rule." *King*, 2011-NMSC-004, ¶ 28 (quoting *Sender*, 1963-NMSC-220, ¶ 13 (internal quotation marks omitted)).

**b.  Respondent had a nondiscretionary duty to conduct elections in full compliance with the Election Code, and equity is not available to circumvent an express statutory scheme**

**{36}**    The statutory framework makes "clear that the Secretary [of State] must follow the Election Code, and does not have the power to change its mandatory provisions." *Herrera*, 2009-NMSC-003, ¶ 12; *see, e.g.*, § 1-2-1(B) (stating that the Secretary's responsibilities as chief election officer include "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the Election Code" and "mak[ing] rules pursuant to the provisions of, and necessary to carry out the purposes of, the Election Code"); §§ 1-2-2(B)-(D) (stating that the Secretary's election-related duties include "supervis[ing] all elections by administering the Election Code," advising county clerks and election officials and workers "as to the proper methods of performing their duties prescribed by the Election Code," and "report[ing] possible violations of the Election Code" to prosecuting authorities). Petitioners and Respondent agree that Respondent is "duty-bound to follow the Election Code."

**{37}**    The relief that Petitioners and Respondent sought—mailing ballots to voters without prior request—is not available under the Election Code provisions for primary elections. Petitioners sought to adapt the procedures for special elections, as set forth in Section 1-24-3, to the June 2020 primary election. *See* § 1-24-3(A) ("All special elections in this state shall be conducted absentee. Mailed ballots shall be used exclusively for voting in special elections."). But the statutes governing special elections plainly cannot apply to primary elections. First, special elections cannot be held concurrently with a primary election, meaning that they are mutually exclusive types of elections. *See* § 1-24-1(C) ("No special election shall be held beginning the seventieth day prior to any statewide election and until . . . the seventieth day following a major political party primary."). Second, special elections may be used to decide ballot questions only. *See* § 1-24-2(A)(2)(c) (stating that a special election proclamation must contain "the text of the ballot question or ballot questions to be voted on"); § 1-1-5.6 ("As used in the Election Code, 'ballot question' means a question submitted to the voters . . . on a ballot . . . and does not include a candidate nomination."). In contrast, primary elections decide the candidates who will be on the ballot in the general election, § 1-8-17(A), and "[n]o bond issue or other question shall be voted upon at any primary election," § 1-8-17(B). Finally, in a special election, ballots must be mailed to voters without prior request, but in a primary election, a ballot may only be mailed to a voter upon the voter's request. *Compare* § 1-24-3(B) (requiring county clerks to mail ballots directly to voters in special elections "[w]ithout requiring a voter to file an application to receive a ballot"), *with* § 1-6-5(F) ("A mailed ballot shall not be delivered by the county clerk to any person other than the applicant for the ballot.").

**{38}**    Despite the requested relief being contrary to the Election Code, Petitioners and Respondent nevertheless argued that we should rely on our inherent equitable powers to craft a remedy that departed from the statutory scheme in order to protect public health. That view of equity is overbroad. "New Mexico courts do not distinguish between actions brought at law or suits brought in equity." *Sims v. Sims*, 1996-NMSC-078, ¶ 27, 122 N.M. 618, 930 P.2d 153. While we "retain preexisting inherent equity jurisdiction,"

we do not rely on equity as "a distinct and self-sufficient juristic system designed to overrule or correct other law." *Id.* ¶¶ 29-30 (internal quotation marks and citations omitted). Rather, equity "functions as a supplement to the rest of the law where its remedies are inadequate to do complete justice." *Id.* (internal quotation marks and citation omitted). Thus, "in the absence of a clear and valid legislative command . . . , the full scope of [a court's] jurisdiction [in equity] is to be recognized and applied." *Id.* (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). On the other hand, when legislation governs an area of law, our equitable powers are "concurrent or supplemental to the legal remedy created by statute." *Id.* ¶ 29. In those situations, we can only fashion a remedy that "fill[s] in the interstices" of the legislation "in accordance with those legal concepts, principles, or objectives which may apply to the situation and that are in harmony and legally compatible with" the legislation. *Gunaji*, 2001-NMSC-028, ¶ 21 (internal quotation marks omitted) (quoting *State ex rel. Olson v. Bakken*, 329 N.W.2d 575, 580 (N.D. 1983)).

**{39}** Our decision in *Gunaji* illustrates this distinction. In that case, we remedied an election problem that was not addressed in the Election Code by "draw[ing] an analogy from a section of the Election Code covering cases closely related to the instant one." *Id.* ¶ 1. In *Gunaji*, the wrong candidates' names had been printed on ballots in one precinct, and sixty-six people cast their votes on the incorrect ballots before the error was discovered. *Id.* ¶¶ 2-3. The Election Code did not prescribe a remedy for that particular problem, so we looked to analogous statutes to determine that the results of the entire precinct should be rejected rather than a new election called. *Id.* ¶¶ 30-35. While we explained the benefits of looking to analogous statutes as a helpful source of law when crafting remedies in the absence of explicit statutory mandates, *id.*, we also made clear that this process could not be used to override a statute that establishes a procedure or remedy, *id.* ¶¶ 21-26.

**{40}** Unlike in *Gunaji*, where no statute mandated the steps to be taken if votes were cast on misprinted ballots, in this case the procedure for conducting primary elections in New Mexico is set forth in detail in Article 8 of the Election Code. Thus, while in *Gunaji* we could craft a remedy by analogizing to similar statutes, here the existing statutory scheme controls. Our equitable powers do not extend so far as to allow us to disregard procedures set forth by statute or to rearrange the Election Code. To do so would violate the separation of powers. *State v. Roy*, 1936-NMSC-048, ¶ 73, 40 N.M. 397, 60 P.2d 646 ("We are committed by our Constitution to the doctrine of separation of powers. It is fundamental that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch. The power to make law is reserved exclusively to the Legislature."). Therefore, we conclude that Respondent had a nondiscretionary duty to follow the primary election procedures set forth in the Election Code, and we cannot order relief that deviates from those procedures.

**c.      Respondent had a nondiscretionary duty to comply with all executive orders**

**{41}**     Respondent's duty to comply with the Election Code was hardly her only duty as a public official. *See* N.M. Sec'y of State, *Secretary of State Duties*, available at https://www.sos.state.nm.us/about-new-mexico/nm-government/secretary-of-state-duties/ (last visited Mar. 31, 2021) (describing the many duties of the Secretary of State, including "perform[ing] all of the functions of the governor" when the Governor and Lieutenant Governor are out of the state). During the pandemic, Respondent had a duty to comply with the Governor's pandemic-related executive orders, as did every other public official. *See* EO 2020-004, 3. In the first of those orders, the Governor imposed an affirmative duty on all public officials to use every means at their disposal to contain the spread of COVID-19 and mitigate its harms. *See* EO 2020-004, 2 (stating that "it is necessary for all branches of State government to take immediate action to minimize the spread of COVID-19" and that "[a]ll branches of State government shall . . . provide resources and services necessary to minimize physical and economic harm and . . . protect lives"). Therefore, *a fortiori*, that order also imposed on Respondent an affirmative duty to take all lawful steps to minimize the spread of COVID-19 and protect lives. In her role as the state's chief election officer, that duty governed her management of the primary election.

**{42}**     The series of executive orders and public health orders issued thereafter demonstrated that protecting lives, in this context, required that opportunities for close contact between people be drastically curtailed. For example, schools and nonessential businesses were closed. *See* State of N.M., Executive Order 2020-005 (Mar. 13, 2020);[15] N.M. Dep't of Health, *Pub. Health Emergency Order Closing all Businesses and Non-Profit Entities Except for those Deemed Essential* (Mar. 23, 2020) (PHO 3-23-20).[16] Mass gatherings were prohibited. *See* PHO 3-16-20, 3; PHO 3-23-20, 4 ¶ 1. And all New Mexicans were directed "to stay at home and undertake only those outings absolutely necessary for their health, safety, or welfare." PHO 3-16-20, 3; PHO 3-23-20, 5. In implementing these measures, the Secretary of Health stated that her intent was "to ensure that our State's citizens are self-isolating to the maximum extent possible in order to minimize the transmission of . . . COVID-19" and that the "core directive underlying this Order is that New Mexicans should not leave their homes unless absolutely necessary or to access essential services." N.M. Dep't of Health, *Amended Pub. Health Order*, 1 (Mar. 19, 2020) (PHO 3-19-20).[17] These orders demonstrate that, in this context, a public official's general duty to protect lives carried with it a specific duty to help people stay at home and self-isolate as much as possible.

---

15*Order Directing the Closure of All Public Schools Until April 6, 2020*, available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (follow hyperlink to "Executive Order 2020-005") (last visited Mar. 31, 2021).

16Available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (follow hyperlink to "03-16-2020 – Public Health Emergency Order") (last visited Mar. 31, 2021).

17Available at https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (follow hyperlink to "03-19-2020 – Public Health Order") (last visited Mar. 31, 2021).

**{43}** Therefore, as the chief election officer of the state, Respondent had a duty to manage the election in a manner that minimized the risk of spreading COVID-19 and protected lives by helping voters stay home as much as possible. As discussed above, the Election Code does not allow for direct mailing of primary ballots. But nothing in the Election Code prevents the Secretary of State from encouraging voters to exercise their right to vote by mail and facilitating absentee voting. *See* § 1-6-4. Thus, Respondent had an affirmative duty arising from the pandemic-related executive and public health orders to mail absentee ballot applications to all eligible New Mexico voters.

## B.      The Remedy in This Case

**{44}** We issued our writ of mandamus to compel Respondent to mail absentee ballot applications to every eligible voter in New Mexico because of the extraordinary public health emergency presented by the COVID-19 pandemic. This remedy promoted the health of the voting public and election workers by making it easier for voters to cast their ballots from the safety of their own homes.[18] We also honored the separation of powers by preserving the Legislature's plenary power to set election procedures. The writ we issued was designed to protect public health, promote free and open elections, and preserve the rule of law.

## III.      CONCLUSION

**{45}** For the foregoing reasons, we granted the writ of mandamus.

**{46}   IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Chief Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**RICHARD C. BOSSON, Justice, Retired**
**Sitting by designation**

**EDWARD L. CHÁVEZ, Justice, Retired**
**Sitting by designation**

---

[18]Voters availed themselves of this option in record numbers in the June 2020 primary election. *See* Rick Nathanson & Ryan Boetel, *Election day turnout light as predicted*, Albuquerque Journal (June 3, 2020, 1:52 a.m.) (noting that voters cast over 250,000 absentee ballots in the June 2020 primary, in comparison with 23,000 absentee ballots in the 2016 primary), available at https://www.abqjournal.com/1462151/primary-voter-turnout-light-as-predicted.html (last visited Mar. 31, 2021). Absentee ballots accounted for almost 60% of all votes cast in the June 2020 primary election. Zainab Ali, et al., *New Mexico's 2020 Primary in the Wake of the Coronavirus*, Lawfare (Sept. 18, 2020, 11:37 a.m.), available at https://www.lawfareblog.com/new-mexicos-2020-primary-wake-coronavirus (last visited Mar. 31, 2021). The increase in absentee voting caused an increase in voter turnout overall. *Id.*

**JUDITH K. NAKAMURA, Justice, Retired**
**Sitting by designation**