The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: January 9, 2025

**NO. S-1-SC-39742**

**STATE OF NEW MEXICO,**
**ex rel. RAÚL TORREZ,**
**New Mexico Attorney General,**

  Petitioner,

v.

**BOARD OF COUNTY**
**COMMISSIONERS FOR LEA**
**COUNTY, BOARD OF COUNTY**
**COMMISSIONERS FOR**
**ROOSEVELT COUNTY,**
**CITY OF CLOVIS, and CITY**
**OF HOBBS,**

  Respondents.

**ORIGINAL PROCEEDING**

Raúl Torrez, Attorney General
James W. Grayson, Chief Deputy Attorney General
Aletheia V.P. Allen, Solicitor General
Nicholas M. Sydow, Deputy Solicitor General
Santa Fe, NM

for Petitioner

John W. Caldwell, Jr., County Attorney
Hobbs, NM

Ray Pena McChristian, P.C.
Jeffrey T. Lucky
Brian P. Brack
Albuquerque, NM

for Respondent Board of County Commissioners for Lea County

NM Local Government Law, LLC
Randy M. Autio
Michael I. Garcia
Albuquerque, NM

Alliance Defending Freedom
Daniel Tadhg Bagley
Erin M. Hawley
Washington, DC

for Respondent Board of County Commissioners for Roosevelt County

Law Offices of Michael J. Seibel
Michael J. Seibel
Albuquerque, NM

for Respondents City of Clovis and City of Hobbs

Efren A. Cortez
Hobbs, NM

for Respondent City of Hobbs

Crowley & Gribble, P.C.
Joseph J. Gribble
Albuquerque, NM

Alliance Defending Freedom
Erin M. Hawley
Washington, DC

for Amici Curiae New Mexico Family Action Movement, Right to Life Committee of New Mexico, and New Mexico Alliance for Life

Peifer, Hanson, Mullins & Baker, P.A.
Mark T. Baker
Rebekah A. Gallegos
Albuquerque, NM

for Amici Curiae Planned Parenthood of the Rocky Mountains, American College of Obstetricians and Gynecologists, and Bold Futures NM

Bleus & Associates, LLC
Nicholas J. Rimmer
Albuquerque, NM

Lawyering Project
Juanluis Rodriguez
Melissa Shube
Brooklyn, NY

for Amicus Curiae Eastern New Mexico Rising

Elinor J. Rushforth
María Martínez Sánchez
Albuquerque, NM

for Amicus Curiae American Civil Liberties Union

**OPINION**

**BACON, Justice.**

## I.   INTRODUCTION

{1}   This mandamus proceeding concerns the authority of county and municipal officials to enact local ordinances regulating abortion, as well as clinics and providers. Exercising our original jurisdiction, we consider whether officials in Lea and Roosevelt counties and the cities of Clovis and Hobbs (Respondents) exceeded their authority by enacting ordinances preempted by state law.

{2}   The ordinances at issue (collectively, the Ordinances) create blanket prohibitions on the mailing or receipt of any abortion-related instrumentality, which purport to be in "compliance with federal law," namely portions of the Comstock Act, 18 U.S.C. §§ 1461-62. *See* Hobbs, N.M., Ordinance No. 1147, chs. 5.52.010-.090 (2022) (Hobbs Ordinance) (amending Title 5 of the Hobbs Muncipal Code); Clovis, N.M., Ordinance No. 2184-2022, chs. 9.90.010-.070 (2023) (Clovis Ordinance) (amending Title 9 of the Clovis City Code); Roosevelt County, N.M., Ordinance No. 2023-01, §§ 1-10 (Jan. 10, 2023) (Roosevelt Cnty. Ordinance); Lea County, N.M., Ordinance No. 99, §§ 1-8 (Dec. 8, 2022) (Lea Cnty. Ordinance). Additionally, three of the Ordinances create licensing schemes (collectively, licensing Ordinances) exclusive to abortion clinics and providers that mandate clinic

compliance with the Comstock Act and vest city commissioners and county managers with sole discretion for licensure approval. *See* Hobbs Ordinance No. 1147, chs. 5.52.030-.060; Clovis Ordinance No. 2184-2022, chs. 9.90.020-.050; Roosevelt Cnty. Ordinance No. 2023-01, §§ 5-8.

{3} The State of New Mexico (the State) seeks a writ of prohibitory mandamus to restrain Respondents from enforcing the Ordinances and to invalidate the Ordinances as preempted by state law. In the alternative, the State argues the Ordinances violate the Equal Rights Amendment under Article II, Section 18 of the New Mexico Constitution. The State contends that by "singl[ing] out abortion for burdensome regulation and civil liability," the Ordinances contain an impermissible sex-based classification that presumptively violates our Equal Rights Amendment. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 2, 126 N.M. 788, 975 P.2d 841 (holding that a rule prohibiting state funding for medically necessary abortions violated the Equal Rights Amendment). Relatedly, the State asserts that the right to terminate a pregnancy is an inherent right embraced under the trifold protections of due process, privacy, and the inherent rights clause. N.M. Const. art. II, §§ 18, 10, 4.

{4} Because we conclude the Ordinances, in their entirety, plainly conflict with provisions of the Reproductive and Gender-Affirming Health Care Freedom Act (the

Health Care Freedom Act or the Act), NMSA 1978, §§ 24-34-1 to -5 (2023), we hold the Ordinances are preempted by state law. Additionally, because the licensing Ordinances conflict with the Medical Practice Act (MPA), NMSA 1978, §§ 61-6-1 to -34 (1978, as amended through 2023); the Medical Malpractice Act (MMA), NMSA 1978, §§ 41-5-1 to -29 (1978, as amended through 2023); the Health Care Code (HCC), NMSA 1978, §§ 24A-1-1 to -20 (1978, as amended through 2024); and the due process provisions of the Uniform Licensing Act (ULA), NMSA 1978, §§ 61-1-1 to -37 (1957, as amended through 2024), we hold the licensing Ordinances are also preempted by those state laws. We therefore decline to reach the State's additional arguments under the New Mexico Constitution. *See Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so." (internal quotation marks and citation omitted)). Our forbearance of the constitutional questions, however, should not be construed as commentary on their merit. Rather, we heed the canon of constitutional avoidance and refrain from deciding constitutional issues unnecessary to the disposition of this case. *Id.*; *see also State v. Radosevich*, 2018-NMSC-028, ¶ 8, 419 P.3d 176 ("[W]e must be guided by the well-established principle of statutory construction that statutes should be

construed, if possible, to avoid constitutional questions." (internal quotation marks and citation omitted)).

{5} We similarly decline to address Respondents' arguments with respect to the Comstock Act and federal preemption, which we deem unnecessary to the resolution of the issues before this Court. We therefore emphasize that our decision to grant the writ of prohibitory mandamus and invalidate the Ordinances on the basis of state law preemption rests solely on state law grounds. *See Michigan v. Long*, 463 U.S. 1032, 1041 (1983) ("If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision.").

## II. BACKGROUND

{6} We first review the factual and legal developments that led to the State's petition for a writ of prohibitory mandamus. The Ordinances did not arise in a vacuum. Indeed, these local laws are precisely the result presaged by the dissent in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 360-61 (2022)

(Breyer, Sotomayor, and Kagan, JJ., dissenting).[1] By overturning *Roe v. Wade*, 410 U.S. 113 (1973), and declaring the authority to regulate abortions a state issue, *Dobbs* invited the kind of intrastate conflicts created by the Ordinances, which must be resolved under state law. *See Dobbs*, 597 U.S. at 302. Ultimately, the issues before this Court reduce to whether mandamus lies in the action brought by the State and whether state law preempts the Ordinances.

**A.     The Repeal of New Mexico's Abortion Ban and Enactment of Laws Protecting Access to Abortion**

{7}     For fifty-seven years, New Mexico classified abortion as a fourth-degree felony offense. *See* NMSA 1953, §§ 40A-5-1 to -3 (1963) (repealed as amended and renumbered 2021). Our criminal code during that period reflected a near-total abortion ban which, while unenforceable under *Roe v. Wade*, imposed criminal liability for providing abortions unless deemed necessary "to preserve the life of the woman or to prevent serious and permanent bodily injury." Sections 40A-5-1 to -3;

---

[1]"And because, as the Court has often stated, protecting fetal life is rational, [s]tates will feel free to enact all manner of restrictions. The Mississippi law at issue here bars abortions after the 15th week of pregnancy. Under the majority's ruling, though, another [s]tate's law could do so after ten weeks, or five or three or one— or, again, from the moment of fertilization. States have already passed such laws, in anticipation of today's ruling. More will follow. Some [s]tates have enacted laws extending to all forms of abortion procedure, including taking medication in one's own home." *Dobbs*, 597 U.S. at 360 (Breyer, Sotomayor, and Kagan, JJ., dissenting).

*see also Roe v. Wade*, 410 U.S. at 164-65. In 2021, our Legislature repealed the state's criminal abortion ban thereby removing significant barriers to abortion access, including abolishing criminal penalties for abortion, eliminating consent requirements for minors seeking an abortion, and abandoning prohibitions on the prescription and dispensing of medication abortions by non-physician medical professionals, such as nurses. *See* NMSA 1978, §§ 30-5-1, -3 (1969), (repealed 2021); *State v. Strance*, 1973-NMCA-024, ¶ 8, 84 N.M. 670, 506 P.2d 1217 (discussing a "justified medical termination").

{8}     The repeal of criminal abortion ushered in subsequent legislative and executive actions that broadened access to abortion. *See, e.g.*, §§ 24-34-1 to -5; State of N.M., Exec. Ord. 2022-107 (June 27, 2022) (clarifying executive policy protecting access to reproductive health care services including abortion); State of N.M., Exec. Ord. 2022-123 (Aug. 31, 2022) (providing funding for a comprehensive reproductive health care clinic in Doña Ana County on the state's southern border). Of central importance to this proceeding, the Health Care Freedom Act, the first substantive enactment affirmatively addressing the right to access reproductive health care in New Mexico, went into effect June 16, 2023. *See* §§ 24-34-1 to -5.

The Act prohibits any public body,[2] entity, or individual from interfering with access to reproductive or gender-affirming health care and imposes penalties for violations of the Act's provisions. Sections 24-34-3 to -4. As public bodies, all cities and counties within the state—including Hobbs, Clovis, Lea County, and Roosevelt County—are subject to the language of the Act. Further, the Act creates a private right of action to bring suit against any public body or entity for violating the Act.[3] Section 24-34-5. Notably, the Ordinances emerged amidst these significant legislative and executive actions protecting access to abortion.[4]

---

[2]Under Section 24-34-2(B), a "public body" is defined as "a state or local government, an advisory board, a commission, an agency or an entity created by the constitution of New Mexico or any branch of government that receives public funding, including political subdivisions, special tax districts, school districts and institutions of higher education."

[3]Pursuant to Section 24-34-5(A), "[a] person claiming to be aggrieved by a violation of the Reproductive and Gender-Affirming Health Care Freedom Act may maintain an action in district court for appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages or punitive damages, or the sum of five thousand dollars ($5,000) for each violation of the Reproductive and Gender-Affirming Health Care Freedom Act, whichever is greater."

[4]The Ordinances were adopted in late 2022 and early 2023: the city of Hobbs ordinance No. 1147 was adopted on November 7, 2022; Lea County ordinance No. 99 was adopted on December 8, 2022; the city of Clovis ordinance No. 2184-2022 was adopted on January 5, 2023; and Roosevelt County ordinance No. 2023-01 was adopted on January 10, 2023.

**B.    The Ordinances Purport to Require Compliance with Federal Law and to Impose Licensing Requirements on Abortion Clinics**

{9}    From our reading of the Ordinances, we distill the following: the Ordinances contain nearly identical language and seek to restrict local access to abortion services by purportedly requiring compliance with the federal Comstock Act. *See* Hobbs Ordinance No. 1147, ch. 5.52.070; Clovis Ordinance No. 2184-2022, ch. 9.90.060; Roosevelt Cnty. Ordinance No. 2023-01, §§ 2, 9; Lea Cnty. Ordinance No. 99, § 6. The Comstock Act, in part, imposes felony liability for the mailing of "[e]very article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; . . . Every article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose."[5] 18 U.S.C. § 1461.

---

[5]In 2022, the Office of Legal Counsel for the United States Department of Justice issued commentary clarifying the application of the Comstock Act. *See Application of the Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, 46 Op. O.L.C. ___ (2022), https://www.justice.gov/olc/opinion/application-comstock-act-mailing-prescription-drugs-can-be-used-abortions (last visited Dec. 20, 2024) ("Section 1461 of title 18 of the U.S. Code does not prohibit the mailing of certain drugs that can be used to perform abortions where the sender lacks the intent that the recipient of the drugs will use them unlawfully. Because there are manifold ways in which recipients in every state may lawfully use such drugs, including to produce an

{10}    The Hobbs, Clovis, and Roosevelt County Ordinances also create unique licensing schemes for the operation of abortion clinics and for the provision of abortions generally. *See* Hobbs Ordinance No. 1147, chs. 5.52.030-.060; Clovis Ordinance No. 2184-2022, chs. 9.90.020-.050; Roosevelt Cnty. Ordinance No. 2023-01, §§ 5-8. Significantly, two of the ordinances broadly define abortion clinics as "any building or facility, other than a hospital, where an abortion of any type is performed, or where abortion-inducing drugs are dispensed, distributed, or ingested." Hobbs Ordinance No. 1147, ch. 5.52.020; Roosevelt Cnty. Ordinance No. 2023-01, § 1(B). Under these definitions, any location where an abortion is performed—other than a hospital—is an abortion clinic subject to the Ordinances' licensure requirements.

{11}    Additionally, the two county ordinances authorize penalties and statutory damages for violation of the ordinances. The Lea County ordinance provides for penalties amounting to $300 per violation of the Comstock Act, which includes aiding and abetting a violation of the Comstock Act. Lea Cnty. Ordinance No. 99, §§ 6-7. Similarly, Roosevelt County's ordinance creates a private cause of action providing that any person can "bring a civil action against any person or entity" that

---

abortion, the mere mailing of such drugs to a particular jurisdiction is an insufficient basis for concluding that the sender intends them to be used unlawfully.").

violates the Comstock Act and upon prevailing may claim statutory damages of "not less than $100,000 for each violation." Roosevelt Cnty. Ordinance No. 2023-01, § 3(A), (B)(3).

{12} In response to the passage of the Ordinances, the State filed a petition for a writ of mandamus and stay of Respondents' enforcement of the Ordinances. The Court granted the stay, ordered briefing, and held oral argument. For the reasons that follow, we now grant the petition for a writ of mandamus.

## III. DISCUSSION

### A. The Exercise of Mandamus Jurisdiction Is Appropriate and Expeditious Resolution of This Issue Is Required

{13} We first consider whether mandamus is the proper remedy for the State's action. We exercise original jurisdiction in mandamus under Article VI, Section 3 of the New Mexico Constitution. *See* N.M. Const. art. VI, § 3 ("The supreme court shall have original jurisdiction in . . . mandamus against all state officers, boards and commissions . . . ; it shall also have power to issue writs of mandamus . . . and to hear and determine the same."); *see also State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 11, 127 N.M. 272, 980 P.2d 55 (discussing the Court's original jurisdiction in mandamus). We reserve our exercise of mandamus for extraordinary circumstances. *See State ex rel. Richardson v. Fifth Jud. Dist. Nominating Comm'n*, 2007-NMSC-023, ¶ 9, 141 N.M. 657, 160 P.3d 566. When

10

appropriate, mandamus has both compulsory and prohibitory effects. *See State ex rel. Sugg v. Oliver*, 2020-NMSC-002, ¶ 7, 456 P.3d 1065 ("[M]andamus is most often applied to compel the performance of an affirmative act . . . [or] to prohibit unconstitutional official action." (internal quotation marks and citations omitted)). Therefore, mandamus "will lie only to force a clear legal right against one having a clear legal duty to perform an act" or "to prohibit unconstitutional official action." *State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 23, 487 P.3d 815 (internal quotation marks and citations omitted). "'In considering whether to issue a prohibitory mandamus, we do not assess the wisdom of the public official's act; we determine whether that act goes beyond the bounds established by the New Mexico Constitution.'" *Adobe Whitewater Club of N.M. v. State Game Comm'n*, 2022-NMSC-020, ¶ 9, 519 P.3d 46 (quoting *Am. Fed'n of State, Cnty. & Mun. Emps. v. Martinez*, 2011-NMSC-018, ¶ 4, 150 N.M. 132, 257 P.3d 952).

{14} Respondents dispute the propriety of mandamus in this case. We have previously held that mandamus will lie when "a petitioner [seeks] to restrain one branch of government from unduly encroaching or interfering with the authority of another branch" and the question concerns "a purely legal issue concerning the non-discretionary duty of a government official." *Sandel*, 1999-NMSC-019, ¶ 11. Under

such circumstances, *Sandel* guides our inquiry through application of a three-part test that queries whether the issue:

> (1) implicates fundamental constitutional questions of great public importance, (2) can be answered on the basis of virtually undisputed facts, and (3) calls for an expeditious resolution that cannot be obtained through other channels such as a direct appeal.

*Id.*

{15} Although this case does not implicate the separation of powers in a strict sense, it is well established that "mandamus is a discretionary writ and flexible by nature." *Riddle*, 2021-NMSC-018, ¶ 25. Indeed, "[t]his Court has never insisted upon a technical approach to the application of mandamus where there is involved a question of great public import and where other remedies might be inadequate to address that question." *Id.* (internal quotation marks and citation omitted). The question here readily meets that standard, where we are called upon to decide whether multiple inferior political subdivisions have unduly encroached on or interfered with the plenary authority of the Legislature. In addition, this question presents a purely legal issue concerning whether Respondents exceeded their authority by enacting the Ordinances in conflict with general laws of the state thereby interfering with the Legislature's plenary authority to make laws regulating abortion clinics and providers. *See Sandel*, 1999-NMSC-019, ¶ 11 (discussing the Court's jurisdiction in mandamus where one branch of government has encroached

12

on another); N.M. Const. art. III, § 1 (establishing separation of powers); NMSA 1978, § 3-17-1 (1993) (establishing municipalities' power to adopt ordinances); NMSA 1978, § 4-37-1 (1975) (establishing counties' power to adopt ordinances).

{16} Of the three *Sandel* factors, only the third requires consideration. We have already determined that the issue implicates great public importance, and we are persuaded that the validity of the Ordinances can be decided on the basis of virtually undisputed facts. We therefore address the parties' arguments about whether the issue "calls for an expeditious resolution that cannot be obtained through other channels such as a direct appeal." *Sandel*, 1999-NMSC-019, ¶ 11.

{17} Expeditious resolution is required here, the State argues, because the Ordinances "severely restrict access to reproductive health care in those cities and counties." The State urges that if we decline to issue prohibitory mandamus, local governments "will continue to pass laws that attempt to regulate and prohibit abortion" and that such laws have a chilling effect on the exercise of New Mexicans' constitutional rights, and on the provision of care by medical professionals. Conceding this matter could have first been brought in district court, the State nonetheless submits that mandamus provides an appropriate means of bringing about definitive resolution.

{18}   Quoting *State ex rel. Bird v. Apodaca*, Respondent Roosevelt County counters that, in general, this Court "defer[s] to the district court so that we may have the benefit of a complete record and so the issues may be more clearly defined." 1977-NMSC-110, ¶ 5, 91 N.M. 279, 573 P.2d 213. While that may be true in general, our consideration of the purely legal question in this case does not suffer for lack of a complete record or clarity. Irrespective of whether relief from the district court may be available, mandamus may still be proper "when issues of sufficient public importance are presented which involve a legal and not a factual determination." *State ex rel. King v. Lyons*, 2011-NMSC-004, ¶ 23, 149 N.M. 330, 248 P.3d 878 (internal quotation marks and citation omitted). This is particularly true when the boundaries of legislative, judicial, or executive power are implicated.

{19}   Alternatively, Respondents argue that an expeditious determination is unnecessary because enforcement of the Ordinances is unlikely. They contend the Ordinances do nothing to restrict access to abortion "because no abortion providers are operating in any of those four jurisdictions." In essence, Respondents claim that the dearth of reproductive health care in their jurisdictions renders the law ineffective to restrict access to abortion. In their view, "[t]here is no need for immediate relief

when there is no evidence or reason to believe that the ordinances are affecting abortion access on the ground."[6]

{20} The State argues that the Ordinances are having a chilling effect on abortion access, contrary to the clearly articulated policy of favoring abortion access established by the Executive and Legislative branches of government. We agree with the State. We cannot countenance Respondents' argument that, because the sought-after care is available 200 miles away and the State has not identified an individual who has been affected, the Ordinances impose no restrictions on access to abortion and an expeditious resolution is unwarranted. To the contrary, we consider the fact that no abortion clinics or providers currently operate in any of the four jurisdictions lends support to the State's claim of the Ordinances' chilling effect and the need for expeditious resolution.

---

[6]Amicus, Eastern New Mexico Rising (ENMR), raises countervailing considerations in explaining why this is not so. Specifically, ENMR argues that the Ordinances' adoption of the Comstock Act's prohibition on the mailing or receipt of any "abortion pills or abortion-related paraphernalia" has a disproportionate impact on pregnant people living in rural communities for whom telemedicine abortion care is the preferred option. The alternative, ENMR points out, is a 200-mile trek to obtain care, a hardship disproportionately borne by low-income people, people of color, and undocumented people. *Accord Dobbs*, 597 U.S. at 361 (Breyer, Sotomayor, and Kagan, JJ., dissenting) ("Above all others, women lacking financial resources will suffer from today's decision.").

{21} Moreover, it does not follow that a lack of abortion providers and clinics in these jurisdictions renders the Ordinances ineffective to restrict access to abortion. Indeed, the proscribed conduct of "shipping or receiving abortion pills or abortion-related paraphernalia" imbues the Ordinances with extraterritorial effect, thereby erecting a dragnet of considerable reach that threatens to ensnare patient and provider alike. Thus, the potential impacts of the Ordinances, including the likelihood that they will have a chilling effect, convince us this issue warrants expeditious resolution.

{22} Yet another factor favors our expeditious resolution of this issue. Additional county and municipal ordinances—nearly identical to those at issue here—are in effect across the state. Consequently, potential conflicts with legislative authority continue unabated. Thus, our resolution of this issue will answer whether these conflicts with state law may continue. Accordingly, because "[t]his Court on several occasions has recognized that mandamus is an appropriate means to prohibit unlawful or unconstitutional official action," and this case implicates encroachment on the Legislature's authority, we determine this issue warrants expeditious resolution. *Sandel*, 1999-NMSC-019, ¶ 11 (internal quotation marks and citation omitted). We therefore turn to the merits of the State's petition.

**B.      County and Municipal Ordinances May Be Preempted by State Law**

{23}      Having determined the exercise of our mandamus jurisdiction is proper, we next examine state law preemption of the Ordinances. The State argues that Respondents' enactment of the Ordinances constitutes an invasion of the Legislature's authority by conflicting with four general state laws: the Health Care Freedom Act, the MPA, the MMA, and the Public Health Act (PHA), NMSA 1978, §§ 24-1-1 to -44 (1973, as amended through 2024). While the State cites Sections 24-1-3 and 24-1-5 of the PHA for purposes of licensure of all health facilities, we note here and incorporate hereafter in its place the HCC, the enactment of which during the pendency of this case transferred the "health facility licensing and certification bureau" to the Health Care Authority (the Authority).[7] *See* § 24A-1-5 annot. (July 1, 2024).

{24}      While federal preemption is a constitutional doctrine "rooted in the Supremacy Clause of the United States Constitution," no such analog to the Supremacy Clause exists in the Constitution of New Mexico. *Schmidt v. Tavenner's*

---

[7]We note the PHA remains a general law despite the relevant role over licensure of health facilities being transferred to the Health Care Authority. *See* § 24-1-3(K) ("The department has authority to . . . ensure the quality and accessibility of health care services and the provision of health care when health care is otherwise unavailable.").

*Towing & Recovery*, *LLC*, 2019-NMCA-050, ¶ 7, 448 P.3d 605; U.S. Const. art. VI. Notwithstanding this federal distinction, state preemption analysis flows from our interpretation of our state constitution as granting the Legislature "plenary . . . authority limited only by the state and federal constitutions." *Daniels v. Watson*, 1966-NMSC-011, ¶ 16, 75 N.M. 661, 410 P.2d 193 (internal quotation marks and citation omitted). Thus, "[l]egislation may be validly enacted if not inhibited by one or the other of these documents." *Id.* Hence, because only the state and federal constitutions abridge the legislative authority, no other branch or subsidiary of state government, including political subdivisions, may curtail the Legislature's plenary authority to legislate. *See* N.M. Const. art. IV, § 1 ("The legislative power shall be vested in a senate and house of representatives which shall be designated the legislature of the state of New Mexico.").

{25}     Preemption doctrine protects the Legislature's plenary authority. *See* N.M. Const. art. X, §§ 5-6 (providing legislative requirements for incorporated counties and home rule municipalities). Sections 3-17-1 (municipal ordinances) and 4-37-1 (county ordinances) govern municipal and county authority to enact laws and, therefore, guide our analysis of preemption. *See Stennis v. City of Santa Fe*, 2008-NMSC-008, ¶ 21, 143 N.M. 320, 176 P.3d 309 ("Under New Mexico law, 'a

18

municipality may adopt ordinances or resolutions not inconsistent with' state law." (quoting § 3-17-1)).

{26} Because Respondent cities of Hobbs and Clovis are home rule municipalities, and Lea and Roosevelt are counties, our application of preemption doctrine requires consideration of the distinct lawmaking authority possessed by both home rule municipalities and counties.[8] Therefore, we begin by delineating the scope of municipal and county authority before analyzing the State's specific preemption challenges. The interpretation of municipal and county ordinances is a question of law reviewed de novo. *See Stennis*, 2008-NMSC-008, ¶ 13 ("Interpretation of municipal ordinances and statutes is a question of law that we review de novo.").

{27} County and municipal power flows exclusively from the state. *See* N.M. Const. art. X, §§ 5-6. Counties and municipalities are "instrumentalities acting under the sovereignty of the state" to whom power has been granted to facilitate a more convenient exercise of local governance. *State v. Rodriguez*, 2005-NMSC-019, ¶ 10, 138 N.M. 21, 116 P.3d 92; *see also* NMSA 1978, § 3-15-7 (1965) (authorizing

---

[8]Respondents Clovis and Hobbs chartered as home rule municipalities in 1971 and 2001, respectively. *See* NM Legislative Handbook, Home Rule Municipalities, https://www.nmlegis.gov/Publications/handbook/home_rule _municipalities_24.pdf (last visited Dec. 23, 2024).

municipal charters to "provide for any system or form of government that may be deemed expedient and beneficial to the people of the municipality").

{28}     Municipal power is granted by and derives from the Legislature through "the process of incorporation under the Municipal [Charter] Act." *New Mexicans for Free Enter. v. City of Santa Fe*, 2006-NMCA-007, ¶¶ 13-14, 138 N.M. 785, 126 P.3d 1149; NMSA 1978, §§ 3-15-1 to -16 (1965, as amended through 2018). As such, municipalities are "an auxiliary of the state government" and subordinate to the state. *City of Albuquerque v. N.M. Pub. Regul. Comm'n*, 2003-NMSC-028, ¶ 3, 134 N.M. 472, 79 P.3d 297 (internal quotation marks and citation omitted); *Temple Baptist Church, Inc. v. City of Albuquerque*, 1982-NMSC-055, ¶ 10, 98 N.M. 138, 646 P.2d 565 ("It is well settled that municipalities have no inherent right to exercise police power; their right must derive from authority granted by the [s]tate.").

{29}     Home rule municipalities are distinct in one significant regard in that they enjoy "a limited form of autonomy from state interference in matters of local concern." *New Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 14; *see also* N.M. Const. art. X, § 6(D). Therefore, municipalities chartered as home rule have greater latitude to "exercise all legislative powers and perform all functions *not expressly denied* by general law or charter." N.M. Const. art. X, § 6(D) (emphasis added).

20

{30}    We have "construed the meaning of 'not expressly denied' . . . to mean that some express statement of the power denied must be contained in the general law in order to effectively limit a municipality's home-rule power." *Casuse v. City of Gallup*, 1987-NMSC-112, ¶ 5, 106 N.M. 571, 746 P.2d 1103 (citation omitted). Therefore, home rule municipalities need not "look to the [L]egislature for a grant of power to act, but only look[] to legislative enactments to see if any express limitations have been placed on their power to act." *New Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 15 (internal quotation marks and citation omitted).

{31}    By contrast, "[a] county is but a political subdivision of the [s]tate, and it possesses only such powers as are expressly granted to it by the Legislature, together with those necessarily implied to implement those express powers." *El Dorado at Santa Fe, Inc. v. Bd. of Cnty. Comm'rs*, 1976-NMSC-029, ¶ 6, 89 N.M. 313, 551 P.2d 1360. Thus, home rule municipalities' authority is positive in nature and retained unless the Legislature has expressly abrogated it, while counties, like non-home rule municipalities, must look to the Legislature for express grants of authority to act. *See* N.M. Const. art. X, § 5(C) ("An incorporated county may exercise all powers and shall be subject to all limitations granted to municipalities by Article 9, Section 12 of the constitution of New Mexico and all powers granted to municipalities by statute."); *see also* § 4-37-1 ("All counties are granted the same

21

powers that are granted municipalities except for those powers that are inconsistent with statutory or constitutional limitations placed on counties."); *State ex rel. Haynes v. Bonem*, 1992-NMSC-062, ¶ 10, 114 N.M. 627, 845 P.2d 150 (noting that non-home rule municipalities incorporated before 1970 "looked to state statutes for express or implied grants of authority, and if they did not find such authority, they could not act").

{32}     As these authorities demonstrate, the power of home rule municipalities and counties is subject to the supremacy of state law. *See* §§ 3-17-1 ("The governing body of a municipality may adopt ordinances or resolutions not inconsistent with the laws of New Mexico."), 4-37-1 ("The board of county commissioners may make and publish any ordinance to discharge these powers not inconsistent with statutory or constitutional limitations placed on counties."). Therefore, when a conflict arises between state and local law, local authority must yield.

{33}     Whether a local law is inconsistent with state law and is therefore preempted requires analysis under our governing test for preemption. We examine whether "the ordinance permits an act the general law prohibits, or vice versa." *Stennis*, 2008-NMSC-008, ¶ 21 (internal quotation marks and citation omitted). We also inquire whether the regulated activity "is of such a character that local prohibitions on those activities would be inconsistent with or antagonistic to that state law or policy." *New*

*Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 43. Additionally, a municipality's "ability to regulate in an area may be preempted either expressly, by the language of a statute, or impliedly, due to a conflict between the local body's ordinances and the contents, purposes, or pervasive scheme of the statute." *San Pedro Mining Corp. v. Bd. of Cnty. Comm'rs*, 1996-NMCA-002, ¶ 9, 121 N.M. 194, 909 P.2d 754. Because municipalities are "presumed to retain the power to exercise [their] normal authority over an activity," express preemption is found where the Legislature has clearly stated its intent to preempt local control. *Id.* Alternatively, implied preemption is found where the ordinance presents a "conflict[] with a state statute or regulation, or if the statute demonstrates an intent to occupy the entire field." *Id.* ¶ 11.

{34} Therefore, our analysis of preemption encompasses three questions: 1) whether there is a general law at issue, 2) whether the exercise of municipal or county power is expressly denied by general law, and 3) whether the municipal or county power is implicitly denied by general law.

**C.     The Ordinances Are Expressly and Implicitly Preempted by State Law**

**1.     The Health Care Freedom Act, MPA, MMA, ULA and HCC are general laws**

{35} A general law is one which "applies generally throughout the state." *Haynes*, 1992-NMSC-062, ¶ 15 (internal quotation marks and citation omitted). In determining whether a law is general, we focus "on the impact of the law and

23

whether it implicates matters of statewide concern, as opposed to matters of purely local concern." *Id.* ¶ 18.

{36} "[F]or a general law to supersede a home rule municipality's charter or ordinance, the subject matter of the general legislative enactment must pertain to those things of general concern to the people of the state." *Id.* (internal quotation marks and citation omitted). Accordingly, the test is "whether it affects all, most, or many of the inhabitants of the state . . . or whether it affects only the inhabitants of the municipality and is therefore of only local concern." *Id.* ¶ 19.

{37} The statutes invoked by the State—the Health Care Freedom Act, MPA, MMA, and HCC—as well as the ULA, implicate "matters of statewide concern, as opposed to matters of purely local concern," and are therefore general laws. *Id.* ¶ 18.

{38} We begin with the Health Care Freedom Act, which comprehensively addresses access to reproductive and gender-affirming health care in the state. *See* §§ 24-34-1 to -5. The Act's general applicability arises from its purpose to protect access to reproductive and gender-affirming health care. *See id.* These are issues "of general concern to the people of the state" that, by virtue of their relationship to

constitutional rights,[9] necessarily "implicate[] matters of statewide concern." *Haynes*, 1992-NMSC-062, ¶ 18; *see also* N.M. Const. art. II, § 18. Thus, Respondents' view that reproductive and gender-affirming health care "affects only the inhabitants of [a] municipality" does not abide with the Act's purpose. *Haynes*, 1992-NMSC-062, ¶ 19.

{39} The Act's general applicability is further demonstrated by its broad proscription of any actions by public bodies and entities that discriminate, restrict, or interfere with "a person's ability to access or provide reproductive health care or gender-affirming health care within the medical standard of care." Section 24-34-3(A)-(B). That proscription would be wholly undermined if it could be evaded or ignored by a local government or other public body. Accordingly, the Health Care Freedom Act is a general law.

{40} The MPA's applicability is similarly comprehensive, as demonstrated by its pervasive regulatory scheme governing physician licensure and practice in the state. Sections 61-6-1 to -34. The MPA's plain language makes its general applicability

___

[9]In *N.M. Right to Choose/NARAL*, this Court held the Equal Rights Amendment precluded the Human Services Department from restricting funding for medically necessary abortions under the state's Medicaid program. Pursuant to the Equal Rights Amendment, we determined that there was "no compelling justification for treating men and women differently with respect to their medical needs." 1999-NMSC-005, ¶¶ 1-2.

abundantly clear. Enacted "to protect the public from the improper, unprofessional, incompetent and unlawful practice of medicine," the MPA vests the medical board with exclusive licensing and disciplinary authority for a physician's practice of medicine. Section 61-6-1(B)-(C). Creating the medical board and vesting it with exclusive authority to license and discipline physicians shows a clear legislative intent for the MPA to apply equally to all practitioners within the state. *See* §§ 6-6-2, -5. Indeed, the medical board's authority under the MPA is subject only to the broader scheme under the ULA. As the name implies, the ULA imposes uniformity in the licensure of professionals in the state of New Mexico and "promote[s] uniformity with respect to the conduct of board hearings and judicial review." Section 61-1-28.

{41}   The ULA outlines the procedural due process afforded its licensees—such as an opportunity for a hearing, notice, and method of service—and imposes consistency on professional licensure and disciplinary actions regardless of the requirements unique to each professional licensing board. *See* §§ 61-1-3, -4, -8, -28. Thus, "because the people of the state have an interest in maintaining a uniform system of conditions," the MPA and ULA apply generally throughout the state. *Haynes*, 1992-NMSC-062, ¶ 18 (internal quotation marks and citation omitted).

{42} The MMA is a similarly comprehensive statute, setting malpractice insurance requirements and limitations on liability for all health care providers in the state. *See* §§ 41-5-5 to -6. Through the MMA, we have recognized that "[t]he Legislature has clearly demonstrated a concern for the health of the citizens of New Mexico as it is affected by the availability of practicing physicians and assured by the availability of malpractice insurance." *Lester v. Hall*, 1998-NMSC-047, ¶ 11, 126 N.M. 404, 970 P.2d 590.

{43} The fourth and final statute at issue, the HCC, encompasses broad public health laws for New Mexico and delineates the powers of the Authority to oversee, in pertinent part, licensure of health facilities throughout the state. Sections 24A-1-3, -5. Indeed, the express statutory purpose of the Health Care Authority Act is "to establish a single, unified department to administer laws and exercise functions relating to health facility licensure." NMSA 1978, § 9-8-3 (2023, as amended through 2024). Further, the HCC directs the Authority to

> (1)    promulgate and enforce rules for the licensure of health facilities under its jurisdiction;
> (2)    license and inspect health facility premises to ensure compliance with laws, rules and public safety; and
> (3)    carry out such other duties as provided by law.

Section 24A-1-3(B). Like the MPA, the HCC imposes uniformity in access and quality of health care throughout the state. *See* § 24A-1-3. Thus, because the HCC

27

affects all inhabitants of the state, we conclude it is a general law. *See Haynes*, 1992-NMSC-062, ¶ 19.

{44} Having concluded that the Health Care Freedom Act, the MPA, the MMA, the ULA, and the HCC are general laws, we turn to whether the Ordinances are expressly or implicitly preempted by these state laws.

**2. The Health Care Freedom Act expressly preempts the Ordinances**

{45} Under our analysis for express preemption, we must determine whether a general law permits acts prohibited by a local ordinance. *See Stennis*, 2008-NMSC-008, ¶ 21. Under the Health Care Freedom Act, the Legislature explicitly preempted conflicting laws or policies implemented by other public bodies: "[a] public body shall not impose or continue in effect any law, ordinance, policy or regulation that violates or conflicts with the provisions of [the Health Care Freedom Act]." Section 24-34-3(D). The Ordinances are antagonistic to this legislative statement of express preemption. *Cf. New Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 43 ("[A]n ordinance will conflict with state law when state law specifically allows certain activities or is of such a character that local prohibitions on those activities would be inconsistent with or antagonistic to that state law or policy."). Therefore, even under the broad grant of authority to home rule municipalities, the Ordinances fail because

28

the Legislature expressly revoked the authority to enact local laws in conflict with the Act.

{46} Further, the Ordinances plainly prohibit what the Health Care Freedom Act permits. Specifically, the Ordinances interfere with access to reproductive health care, in direct contravention of the Act. Section 24-34-3(A)-(D). The non-exhaustive list of reproductive and gender-affirming services protected by the Act includes abortion.[10] Therefore, the Ordinances' prohibitions on mailing abortion medication and the licensing Ordinances' requirements for abortion providers and expansive definitions of "abortion clinic," Hobbs Ordinance No. 1147, ch. 5.52.020; Roosevelt Cnty. Ordinance No. 2023-01, § 1(B), work in tandem to deny, restrict, and interfere "with a person's ability to access or provide reproductive health care." Section 24-34-3(B).

{47} Respondents dispute preemption by the Act, arguing the Ordinances merely enforce compliance with, and are duplicative of, federal law. We disagree. While the Ordinances restate the Comstock Act's prohibitions, they do not, as Respondents

---

[10]Section 24-34-2(C) lists the following services: "(1) preventing a pregnancy; (2) abortion; (3) managing a pregnancy loss; (4) prenatal, birth, perinatal and postpartum health; (5) managing perimenopause and menopause; (6) managing fertility; (7) treating cancers of the reproductive system; or (8) preventing or treating sexually transmitted infections."

claim, "simply parrot" federal law. The Ordinances go significantly beyond federal requirements by, among other things, purporting to regulate access to and licensure of so-called abortion clinics and physicians in a manner that prohibits or interferes with access to reproductive health care. Our Legislature's adoption of the Health Care Freedom Act is an express rebuke of Respondents' actions. Indeed, the Legislature seemingly contemplated local dissent and ensured that any conflicting law would be expressly preempted by the Act. *See* § 24-34-3(D). By invalidating any existing law and prohibiting any prospective law in conflict, the Act supplied the "express limitations . . . on [Respondents'] power to act." *New Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 15; *see* § 24-34-3(D).

{48}     Therefore, because the Legislature stated its intent to abrogate any current or prospective law in conflict with its provisions, we hold the Ordinances are expressly preempted by the Act. Section 24-34-3(D).

**3.     The MPA, the MMA, and the ULA implicitly preempt the licensing Ordinances**

{49}     While the foregoing analysis is sufficient to grant the relief sought by the State, we also hold that the licensing Ordinances are implicitly preempted by the MPA and ULA because of the Legislature's "intent to occupy the entire field" of licensure for medical professionals. *San Pedro Mining Corp.*, 1996-NMCA-002, ¶ 11. The purpose of the MPA is to "provide laws and rules controlling the granting

30

and use of the privilege to practice medicine and to establish a medical board to implement and enforce the laws and rules." Section 61-6-1(B). The pervasive regulatory scheme under both the MPA and ULA demonstrates the Legislature's intent to occupy the field of medical licensure specifically, and state professional licensure generally. *See Casuse*, 1987-NMSC-112, ¶ 6 ("[A]ny New Mexico law that clearly intends to preempt a governmental area should be sufficient without necessarily stating that affected municipalities must comply and cannot operate to the contrary." (citation omitted)). The MMA affects the same pervasive regulatory scheme by effecting "adequate access to health care services" and a process for recovery "for any malpractice claims." *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 20, 309 P.3d 1047.

{50}    The Ordinances prohibit any person from violating the Comstock Act's provisions under 18 U.S.C. § 1462(c) (mailing or receipt of any abortion pills or abortion-related paraphernalia). *See* Hobbs Ordinance No. 1147, ch. 5.52.070; Clovis Ordinance No. 2184-2022, ch. 9.90.060; Roosevelt Cnty. Ordinance No. 2023-01, §§ 2, 9; Lea Cnty. Ordinance No. 99, § 6. As previously noted, the Hobbs and Roosevelt ordinances define abortion clinics in exceedingly broad terms, the effect of which potentially subjects any provider operating outside a hospital to the Ordinances' licensing schemes. *See* Hobbs Ordinance No. 1147, ch. 5.52.020;

31

Roosevelt Cnty. Ordinance No. 2023-01, § 1(B). This is because a provider who performs an abortion in "any building or facility, other than a hospital" must first apply for what the Ordinances term an "abortion license." *See* Hobbs Ordinance No. 1147, chs. 5.52.020-.030; Roosevelt Cnty. Ordinance No. 2023-01, §§ 1(B), 5; *see also* Clovis Ordinance No. 2184-2022, ch. 9.90.020 (creating a licensure requirement for abortion clinics). Failure to secure an abortion license and any activity that purportedly violates the Comstock Act results in a violation of the ordinance. *See* Hobbs Ordinance No. 1147, chs. 5.52.030-.070; Roosevelt Cnty. Ordinance No. 2023-01, §§ 5-9; Clovis Ordinance No. 2184-2022, chs. 9.90.020-.060.

{51} The Ordinances' requirements for a separate license to perform an individual medical procedure is incongruous with the purpose of uniformity in licensing under the ULA. *See* § 61-1-28. Further, the manner of piecemeal licensure imposed by the licensing Ordinances and potential liability for practitioners who provide abortion-related care would defeat the MPA's purpose to ensure the practice of medicine within the standard of care that applies equally to all procedures, as well as the legislative intent of the MMA to ensure availability of health care. *See* § 61-6-1; *Baker*, 2013-NMSC-043, ¶¶ 16-17.

{52} Moreover, by placing the authority to issue and revoke licenses with county managers and city commissioners, the licensing Ordinances disregard the due process protections enshrined in the ULA to ensure professionals seeking a license have adequate notice and opportunity to respond to violations. *See* §§ 61-1-3, -4, -8, -28; Hobbs Ordinance No. 1147, ch. 5.52.060; Clovis Ordinance No. 2184-2022, ch. 9.90.050; Roosevelt Cnty. Ordinance No. 2023-01, § 8. More directly, the licensing Ordinances conflict with the ULA's express prohibition of actions by boards against licensees or license applicants related to protected health care activity as defined in the Health Care Freedom Act. *See* § 61-1-10.1. Again, it would be incongruous to allow Respondents to discipline licensed professionals for activities that are exempt from discipline by their own licensing boards. Therefore, we are unpersuaded by Respondents' claims that the ordinances are "not a 'medical licensing regime'" and that the ordinances "do nothing to restrict physicians or anyone else from performing abortions in New Mexico."

{53} If permitted to stand, the licensing Ordinances would subvert the state's regulatory regime for the practice of medicine. The purpose of the MPA is to "provide laws and rules controlling the granting and use of the privilege to practice medicine." Section 61-6-1(B). The Ordinances disrupt this purpose by creating a parallel system under which pregnant people would be disproportionately exposed

to the very risks the MPA seeks to eliminate—"the improper, unprofessional, incompetent and unlawful practice of medicine." *Id.* Additionally, the Ordinances' requirements implicate the availability of health care services and providers in the state, thus conflicting with the legislative goals of the MMA. *See Baker*, 2013-NMSC-043, ¶ 16 (noting the MMA "provid[ed] incentives to persons to furnish health care services" to ensure their availability (citation omitted)). Our test is unequivocal: "when two statutes that are governmental or regulatory in nature conflict, the law of the sovereign controls." *Casuse*, 1987-NMSC-112, ¶ 6. Accordingly, we hold the licensing Ordinances are implicitly preempted by the MPA, MMA, and ULA.

**4.     The HCC implicitly preempts the licensing Ordinances**

{54}     Lastly, we conclude the licensing Ordinances are implicitly preempted by the HCC for two reasons. First, the Legislature has demonstrated an intent to preempt under the HCC by creating a comprehensive licensing scheme addressing the requirements for operating a health facility. *See* § 24A-1-5; 8.370.18.2 NMAC. Pertinent here, the Authority's power pursuant to the HCC extends to definition and licensure of health facilities throughout the state, the scope of which encompasses "abortion clinics" as defined in the Hobbs and Roosevelt ordinances and discussed

above.[11] *See* § 24A-1-5; Hobbs Ordinance No. 1147, ch. 5.52.020; Roosevelt Cnty. Ordinance No. 2023-01, § 1(B). Additionally, to ensure uniformity across the state, health facility regulations governing licensure requirements for all manner of health facilities have been promulgated under the Authority's purview. *See* 8.370.18 NMAC. Specifically, the HCC mandates that "a health facility shall not be operated without a license *issued by the authority*," and the regulations identify the Authority as the exclusive licensing entity for health facilities. Section 24A-1-5(A) (emphasis added); 8.370.18.7(J) NMAC.

{55}     The Authority's rules also include licensure procedures to which various kinds of health facilities are subject. 8.370.18.9-.18 NMAC. Under these rules, "[a] one-year nontransferable license shall be issued to any health facility complying with all rules of the authority." Section 24A-1-5(E). Thus, the license is conditioned solely on compliance with the rules of the Authority.

---

[11]The HCC defines a "health facility" as "a public hospital; profit or nonprofit private hospital; general or special hospital; outpatient facility; crisis triage center; freestanding birth center; adult daycare facility; nursing home; intermediate care facility; assisted living facility; boarding home not under the control of an institution of higher learning; shelter care home; diagnostic and treatment center; rehabilitation center; infirmary; community mental health center that serves both children and adults or adults only; or a health service organization operating as a freestanding hospice or a home health agency." Section 24A-1-2(D).

{56} The licensing Ordinances usurp the Authority's licensing authority, principally by imposing separate licensing requirements for the operation of a health facility and secondarily by creating new requirements beyond that which is mandated by state law. For example, under the licensing Ordinances, an abortion clinic or health facility providing abortions must provide a statement of compliance with the Comstock Act. *See* Hobbs Ordinance No. 1147, ch. 5.52.040(F); Clovis Ordinance No. 2184-2022, ch. 9.90.030(F); Roosevelt Cnty. Ordinance No. 2023-01, § 6(F). The licensing Ordinances thus eschew the Authority's facility licensing requirements in favor of their own and contravene the HCC by attempting to "control the manner" in which licenses are issued. *See ACLU v. City of Albuquerque*, 1999-NMSC-044, ¶¶ 11, 17, 128 N.M. 315, 992 P.2d 866 (holding an Albuquerque curfew ordinance was implicitly preempted by state law).

{57} Second, the Legislature has implicitly preempted the licensing Ordinances by virtue of the HCC's "statutory grant of authority to another governmental body"— the Authority—and piecemeal local action would be inconsistent with the Authority's delegated role. *New Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 20. In *New Mexicans for Free Enterprise*, the Court of Appeals held the Minimum Wage Act did not preempt a municipal wage ordinance, in part, because the act did "not grant comprehensive authority to set minimum wages to the state." *Id.* Conversely,

here, the HCC grants comprehensive authority as the sole licensing entity for health facilities to the Authority. *See* § 24A-1-5(A) ("A health facility shall not be operated without a license issued by the authority."); 8.370.18.7(J) NMAC.

{58}    By placing the power to approve or deny licenses with city commissions and county managers, the Ordinances impermissibly intrude upon the Authority's exclusive licensing purview. *See* Hobbs Ordinance No. 1147, ch. 5.52.050 and Clovis Ordinance No. 2184-2022, ch. 9.90.040 (placing authority to issue a license with the city commissions); Roosevelt Cnty. Ordinance No. 2023-01, § 7 (placing authority to issue a license with the County Manager). In short, because the HCC creates a comprehensive licensing scheme for operating a health facility throughout the state and specifically governs health facility licensure, we conclude the licensing Ordinances are preempted. *See* § 24A-1-5; 8.370.18.2 NMAC.

**D.    Respondents Exceeded Their Constitutional and Statutory Authority**

{59}    In addition to being explicitly and implicitly preempted by multiple state laws, the Ordinances purportedly create individual rights that affect matters beyond Respondents' authority under the New Mexico Constitution and statutes. Local governments may not enact "private or civil laws governing civil relationships except as incident to the exercise of an independent municipal power." N.M. Const. art. X, § 6(D). Roosevelt County's ordinance authorizes a private right of action

37

providing that any person other than a government employee may bring civil action and seek statutory damages of "not less than $100,000 for each violation" of the section of the ordinance requiring individuals to comply with the Comstock Act. Roosevelt Cnty. Ordinance No. 2023-01, §§ 3, 2(A)-(C). The Lea County ordinance imposes a $300 fine for violations, including for "conduct that aids or abets . . . violations" of the Comstock Act. Lea Cnty. Ordinance No. 99, §§ 6.3, 7.

{60}     Respondents argue the Ordinances constitute a lawful exercise of their police powers to license business and legislate for the health and safety of county and municipal inhabitants. However, "[a] municipality has no inherent right to exercise police power. Its powers are derived solely from the state." *City of Santa Fe v. Gamble-Skogmo, Inc.*, 1964-NMSC-016, ¶ 7, 73 N.M. 410, 389 P.2d 13. Because Respondents' authority to regulate health care access and physician licensure is entirely preempted, Respondents' police powers in these areas are extremely limited. To the extent Respondents have any residual authority, they certainly have no power to supplant the will of the statewide electorate in favor of their own. While we decide this case under the preemption doctrine, we strongly admonish Respondents for exceeding their authority under Article X, Section 6(D) of the New Mexico Constitution. Creating a private right of action and damages award that is clearly

intended to punish protected conduct far exceeds any interest that is "incident[al] to the exercise of an independent municipal power." N.M. Const. art. X, § 6(D).

## IV.  CONCLUSION

{61}  Our Legislature granted to counties and municipalities all powers and duties not inconsistent with the laws of New Mexico. The Ordinances violate this core precept and invade the Legislature's authority to regulate access to and provision of reproductive health care. Therefore, based on the independent and adequate state law grounds provided in the Reproductive and Gender-Affirming Health Care Freedom Act, the Medical Practice Act, the Medical Malpractice Act, and the Health Care Code, as well as the Uniform Licensing Act, we hold the Ordinances are preempted in their entirety. Accordingly, we grant the writ of mandamus prohibiting Respondents from enforcing the Ordinances.

{62}  **IT IS SO ORDERED.**

_____

**C. SHANNON BACON, Justice**

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**